**Aurora LUNA, Plaintiff,**

v.

**STAR OF INDIA, her engines, tackle, apparel and furniture, and Maritime Museum Association of San Diego, Defendant.**

**Civ. No. 72-353-GT.**

United States District Court,
S. D. California.

March 8, 1973.

William F. Logan, San Diego, Cal., for plaintiff.

Arthur W. Jones, Jones, Tellam, Irving & Estes, San Diego, Cal., for defendant.

## MEMORANDUM DECISION AND ORDER

GORDON THOMPSON, Jr., District Judge.

This action was brought by the plaintiff for injuries allegedly suffered when she slipped and fell on a stairway aboard the defendant Star of India (Star). The sole issue raised by the defendants' motion to dismiss is whether the suit properly lies within the admiralty jurisdiction of this Court. It is admitted that there is no diversity jurisdiction under 28 U.S.C. § 1332.

### I

The following facts are essentially undisputed. The defendant Star of India is a three masted bark which slid down the launching-ways at Ramsey in the Isle of Man in 1863. Today, as the oldest merchant vessel afloat, she stands moored in North San Diego Bay at the Embarcadero near the foot of Ash Street, where she attracts thousands of visitors each year. Although the Star sailed around the world 21 times in her heyday, she eventually fell into grave disrepair and was headed for scrap when a group of concerned local citizens decided to preserve her as an historical relic. The square-rigger was towed to San Diego for this purpose in 1923, but due to the Depression no significant restoration was undertaken until 1959. At that time another group of citizens had her dry-docked and surveyed and determined that it would be worth the effort to repair her. The Star of India is cur-rently owned by the Maritime Museum Association of San Diego (Association) which charges visitors a modest admission to come aboard and inspect the accommodations of her nineteenth century travelers and crew members. She has not been engaged in maritime commerce, therefore, since at least 1923, and has not been subject to the Coast Guard inspection and navigation laws since at least March 1969 when the Association presented evidence to that agency that the Star was permanently moored to the Embarcadero and was not intended to be used in the future as anything more than a floating museum.

It was pointed out to the Coast Guard Officer in Charge of Marine Inspection that the bow and stern lines were of anchor chain and could not be slipped without tools not available to the ordinary mischief maker. This evaluation was accepted by the inspector who also noted the use of shore connections for electric power and water. In a letter dated March 26, 1969, he finally determined that the Star was "substantially a land structure" and therefore exempt from the ordinary inspection and navigation laws. Subsequently, on March 19, 1971, the Star was removed from documentation by the Coast Guard, based on the above determination that she was "substantially a land structure."

The plaintiff's injury allegedly occurred on the evening of September 26, 1971, as she was going aboard the Star as an invited guest of a club which was holding a party on the premises. It is alleged that the plaintiff fell as she was descending the metal stairway leading from the top of the starboard rail to the quarter deck. This was the only regularly maintained access from shore. It is not clear why the plaintiff fell or what the extent of her injuries happen to be.

### II

Since there was no dispute that the alleged negligence and injury both occurred aboard the Star of India, we are not presented with the "metaphysical"

task of determining the "locality" of the tort. See Peytavin v. Government Employees Insurance Co., 453 F.2d 1121, 1122–1124 (5th Cir. 1972), and cases cited therein. The locality was admittedly maritime since the Star was afloat on navigable waters at the time in question, *i. e.*, San Diego Bay.

■ Nevertheless, the defendants urge the Court to reject admiralty jurisdiction in this case, since the plaintiff has allegedly failed to demonstrate a sufficient maritime "nexus" between her injury and the ordinary concerns of the laws of admiralty. It is argued that such a maritime nexus, or connection, is necessary, in addition to maritime locality, to warrant the invocation of admiralty tort jurisdiction. This is the so-called "locality plus" test, which has been adopted by at least two other Circuits, Chapman v. City of Grosse Pointe Farms, 385 F.2d 962 (6th Cir. 1967), and Peytavin v. Government Employees Insurance Co., *supra,* as well as two District Courts, McGuire v. City of New York, 192 F.Supp. 866 (S.D.N.Y.1961) and Smith v. Guerrant, 290 F.Supp. 111, 113 (S.D.Tex., Galveston Div., 1968).

The plaintiff correctly points out that these decisions are of persuasive value only and cites various decisions of the Ninth Circuit which she believes require the application of the "strict locality" test of admiralty tort jurisdiction in this case. The first of these cases is Wilson v. Transocean Airlines, 121 F. Supp. 85 (N.D.Cal.1954), a wrongful death action arising from the crash of an airliner into the sea some 325 miles east of Wake Island. The question presented was whether the Death on the High Seas Act, 46 U.S.C. §§ 761–767, was the plaintiff's exclusive remedy for wrongful death. District Judge Goodman held that it was, relying primarily on the legislative history of the Act itself. 121 F.Supp. at 87–91.

It is true that the further question was raised whether the High Seas Act applied to airplanes which are flying *over* the ocean rather than navigating *on* it. In resolving this issue, the Court employed the mechanics of the "locality" rule and concluded that if the decedent had been merely injured rather than killed, his suit would have fallen within the admiralty jurisdiction, since:

"In applying the 'locality' test for admiralty jurisdiction the tort is deemed to occur, not where the wrongful act or omission had its inception, but where the impact of the act or omission produces such injury as to give rise to a cause of action." [Citing The Plymouth, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125 (1865).] 121 F. Supp. at 92.

However, the later Ninth Circuit case of Higa v. Transocean Airlines, 230 F.2d 780 (1955), apparently arising out of the same airplane crash as *Wilson,* indicates that this additional discussion of locality was probably unnecessary to establish admiralty jurisdiction. For the Circuit Court in *Higa,* after concluding that the legislative history required that actions based on the Death on the High Seas Act be brought only in the federal courts sitting in admiralty, went on to observe:

"Our disposition of this case makes unnecessary the determination whether the High Seas Act applies to airplanes which are not in any way water navigating vessels." 230 F.2d at 786.

In any event, the confusion generated by plane crashes into navigable waters has now been largely resolved by the recent Supreme Court case of Executive Jet Aviation v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454, 1972, wherein the Death on the High Seas Act was explicitly found to cover air crashes such as gave rise to the *Transocean* cases, above. After concluding that the "locality plus" test must be applied to most air crashes into navigable waters, Justice Stewart added the following footnote:

"Of course, under the Death on the High Seas Act, a wrongful death action arising out of an airplane crash on the high seas beyond a marine

league from the shore of a State may clearly be brought in a federal admiralty court." 409 U.S. 249, at 271, 93 S.Ct. 493, at 506, n. 20.

Although the other Ninth Circuit decisions cited by the plaintiff may give lip-service to the "strict locality" rule, each contains a sufficient maritime nexus which renders it consistent with the "locality plus" rule of admiralty tort jurisdiction. Mings v. United States, 222 F.Supp. 996 (S.D.Cal.C.D., 1963), (longshoreman injured while working aboard public vessel currently in commission); Hess v. United States, 259 F.2d 285 (9th Cir. 1958), (deceased drowned when a tugboat in which he was riding sank on navigable section of Columbia River in Oregon); United States v. Matson Navigation Co., 201 F.2d 610 (9th Cir. 1953), (ship collided with dike; Admiralty Extension Act, 46 U.S.C. § 740, applied to establish jurisdiction); State of California Department of Fish and Game v. S. S. Bournemouth, 307 F.Supp. 922 (C.D. Cal.1969), (vessel discharged bunker oil while moored in navigable waters; tort held to be "maritime in nature").

At the same time, this Court is greatly impressed by the soundness of reasoning to be found in the arguments of the critics of the "strict locality" rule. Perhaps their arguments have been stated most aptly in Smith v. Guerrant, *supra,* a case which involved damages to a fork-lift truck which was dropped into navigable waters. The accident occurred when the boom of defendant's shore-based crane collapsed as it was lifting the truck from a jetty up to a dock. In denying admiralty tort jurisdiction, District Judge Noel observed:

"The first Congress created the district courts and gave them exclusive jurisdiction in admiralty cases to permit them to oversee the uniform development of maritime law. At the same time, it recognized that uniformity is not essential in all cases technically within the admiralty and maritime jurisdiction; it therefore provided that cases traditionally litigable under the common law might be tried, at the option of the claimant, in either forum. [28 U.S.C. § 1333(1)]. Uniformity is desirable where the litigation and the issues to be resolved are related in some fashion to maritime transportation, the industry whose special problems created the need for a specialized branch of the law. Disputes like the present one, which is only incidentally related to navigable waters and wholly unconnected with maritime commerce, can be litigated in the state courts under the diverse rules of state law without affecting maritime endeavors. The basis for this special grant of admiralty jurisdiction is absent here." 290 F.Supp. at 113 (footnotes omitted). *See also* Black, Admiralty Jurisdiction: Critique and Suggestions, 50 Col.L.Rev. 259, 261 (1950); 1 Benedict on Admiralty § 1 and cases cited n. 2 at p. 1.

■ A general review of these and other authorities, as well as the decisional law on this subject, leaves this Court to share in Mr. Benedict's "celebrated doubt" as to:

"whether the Civil Admiralty Jurisdiction, in cases of tort, does not depend upon the relations of the parties to some ship or vessel and embrace only those tortious violations of maritime right and duty which occur in relation to vessels to which the admiralty jurisdiction in cases of contract applies." 1 Benedict on Admiralty, § 127 at p. 351.

Justice Stewart's examination of the extent of admiralty tort jurisdiction in *Executive Jet Aviation, supra,* led him to synopsize as follows:

"In sum, there has existed over the years a judicial, legislative, and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical

application of the locality test." 409 U.S. at 261, 93 S.Ct. at 501.

This Court concurs in Justice Stewart's conclusion and holds with the view of Judge Peck in Chapman v. City of Grosse Pointe Farms, *supra,* that:

"While the locality alone test should properly be used to exclude from admiralty courts those cases in which the tort giving rise to the lawsuit occurred on land rather than on some navigable body of water, it is here determined that jurisdiction may not be based solely on the locality criteria. A relationship must exist between the wrong and some maritime service, navigation or commerce on navigable waters. Absent such a relationship, admiralty jurisdiction would depend entirely on the fact that a tort occurred on navigable waters; a fact which in and of itself, in light of the historical justification for a federal admiralty jurisdiction, is quite immaterial to any meaningful invocation of the jurisdiction of admiralty courts." 385 F.2d at 966.

### III

 Notwithstanding the foregoing conclusion that the "locality plus" test appropriately governs here, the question remains whether the plaintiff has alleged a sufficient maritime nexus to bring her suit within the ambit of admiralty jurisdiction. If so, this Court may still entertain her cause of action. Specifically, if the Star of India is found to be a "vessel" the requirement should be satisfied, for as Judge Dawson concluded in McGuire v. City of New York, *supra:*

"Admiralty was the result of commerce on the high seas; the commerce made possible by sailing vessels. Just as vessels were the source of admiralty, they remained the *focal point* of admiralty jurisdiction. In very general terms, admiralty jurisdiction relates to things occurring on or to vessels or as a result of the employment of vessels." 192 F.Supp. at 871.

But the defendants contend that the Star of India should not be considered a "vessel" within the statutory definition of 1 U.S.C. § 3. (Rules of Construction of the U.S.Code). That statute provides as follows:

"The word 'vessel' includes every description of water craft or other artificial contrivance used, *or capable of being used,* as a means of transportation on water." (Emphasis supplied.)

The Association argues that despite her numerous circumnavigations of the globe, the Star has been withdrawn from commerce for some 40 years and has recently been exempted from compliance with the inspection and navigation laws by the Coast Guard, in view of the owner's express intent to maintain her as a maritime museum.

It is true that on March 26, 1969, the local Coast Guard Officer in Charge of Marine Inspections issued a letter to the Association expressing his opinion that:

"[T]he Star of India qualifies as 'substantially a land structure' since it is established that the moorings cannot be inadvertently or accidently [*sic*] cast off, that it would not likely break its moorings, or that it could not be moved without special effort, such as with the use of tools."

This officer also noted that electric power and water were to be supplied from shoreside connections. On this basis, the Coast Guard granted its exemption. However, the March 26th letter went on to add:

"Necessarily this classification is predicated on present arrangements. Should future changes be contemplated it would be advisable to contact this office to determine the ramifications thereto [*sic*]."

Finally, reports of "scheduled periodic inspections of the hull" were requested to be forwarded to the Coast Guard when made.

A subsequent letter from the Coast Guard dated December 4, 1972 confirmed "the fact that the Star of India, Official Number 136 801 is not present-

ly documented," and had been removed from that status on March 19, 1971, "for the reason that the *vessel* had been determined to be substantially a land structure" (emphasis supplied). The confusion evidenced by this self-contradictory statement exemplifies the difficulty faced in attempting to categorize this former queen of the seas.

■ Perhaps for the Coast Guard's immediate purposes, it was correct to exempt the Star of India from the inspection and navigation laws and to remove it from documentation. The defendant Association represented that the Star was not to be moved and as such would be generally out of the ordinary flow of maritime traffic on San Diego Bay. It is interesting to note, however, that the Coast Guard was concerned about the possibility of the Star's being moved and that it desired to know about any plans of the Association to do so. The Coast Guard also evidenced concern about the continued seaworthiness of the Star's hull. In sum, the Court does not consider the opinion of the Coast Guard Marine Inspector to be conclusive on the question of whether the Star is a "vessel" for purposes of the law of admiralty.

Rather, it finds that the reported decisions do not evidence a tendency by the courts of admiralty to classify floating objects as "land structures" so easily as does the Coast Guard in this instance. Peytavin v. Government Employees Insurance Co., *supra,* involved an automobile accident that occurred when the defendant's car rear-ended that of the plaintiff while the latter was parked on a floating pontoon which served as a ferryboat landing. The Fifth Circuit held that there was no admiralty tort jurisdiction, since it found that the accident lacked "substantial connection with maritime activities or interests." 453 F.2d at 1127. However, the Court rejected the defendant's argument that the floating pontoon was merely "an extension of land" and therefore outside of maritime jurisdiction. Judge Gewin reasoned as follows:

"While we agree with the district court that this automobile accident is not subject to admiralty jurisdiction, we do not think this holding is properly reached simply by categorizing a floating pontoon held in place by two cables as an 'extension of land.' Certainly the performance of the pontoon tends to make it a 'functional' extension of land. But the common characteristics of the 'extension of land' cases have been that the structures involved *did not float on the water and were in some manner firmly and permanently fastened to land.*" 453 F.2d 1125 (emphasis added).

Further on, the Court cited Hastings v. Mann, 340 F.2d 910 (4th Cir. 1965), for the following rule:

"To come within the land extension rule, of course, the structure must be *firmly attached to the land.* A vessel moored to a dock does not become an extension of the land *nor do other structures secured to the shore by cables, or other temporary means.*" 340 F.2d at 911 (emphasis added).

This Court's own review of the case law on this subject yields the observation that those decisions in which the "extension of land" theory has been seriously advanced have normally dealt with piers, Nacirema Co. v. Johnson, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969), bridges, Evans v. Louisiana Department of Highways, 430 F.2d 1280 (5th Cir. 1970), artificial island drilling rigs, Rodrigue v. Aetna Casualty, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969), or boat launching ramps, Hastings v. Mann, *supra,* the latter two of which were securely fastened to the bottom. This Court is simply unable to equate what appears to be a fully rigged sailing bark with any of these aforementioned structures. The Star could admittedly float free but for her mooring cables, and it is not suggested that her shoreside power and water connections would greatly hinder her progress seaward should she otherwise slip her moorings.

There remains to consider, however, the defendant's contention that the Star of India is functionally not a "vessel," since it is the intent of the owners to employ her solely as a maritime museum and, for that purpose, they have effectively withdrawn her from navigation. The cases cited in support of that position, however, fall short of resolving the precise issue before this Court. Gonzales v. United States Shipping Board, 3 F.2d 168 (E.D.N.Y.1924), was a District Court case where the plaintiff claimed to be a "seaman" and thereby covered by the Jones Act (46 U.S.C. § 688). The plaintiff there was employed as a workman aboard various vessels of a "mothball fleet" on the Hudson River. The Court found that he was not a "seaman" for purposes of the Jones Act since the ships on which he worked were not "in navigation" and therefore not "vessels." The Court admitted that it was ignoring the general statutory definition of "vessel" found in 1 U.S.C. § 3 in favor of the definition set forth in the Revised Statutes, § 4612 (46 U.S.C. § 713), which provided, in part:

> "The term 'vessel' shall be understood to comprehend every description of vessel *navigating* on any sea or channel, lake or river." (Emphasis added.)

The District Court held that this definition applied in determining whether the plaintiff was a "seaman." Similarly, in New England Fish Co. v. Barge or Vessel Sonya, 332 F.Supp. 463 (D.Alaska 1971), the issue was whether the plaintiff qualified as a "seaman" for purposes of establishing a valid preferred maritime lien for "wages of the crew of [a] vessel" under 46 U.S.C. § 953(a). There, too, the emphasis was placed on a requirement that the vessel be employed in navigation in order for the plaintiff to be deemed a "seaman" or a member of the "crew of the vessel."

In the instant case, however, the plaintiff does not purport to be a seaman covered by the Jones Act or a crew member entitled to a preferred maritime lien for wages. She merely claims to be a visitor aboard the Star of India injured in a maritime tort. In such a case, we conclude that the broader definition of "vessel" is applicable, *i. e.*, "every description of water craft or other artificial contrivance used, *or capable of being used,* as a means of transportation on water." 1 U.S.C. § 3 (emphasis added).

It is significant to note that in those other cases where one or another floating object has been held not to be a "vessel," the structure has been either constructed especially for a purpose other than navigation, Evansville Co. v. Chero Cola Co., 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1925), a ("wharf-boat" built primarily as an office, warehouse and wharf), *but see,* Petition of Kansas City Bridge Co., 19 F. Supp. 419 (W.D.Mo.W.D.1937), or has been extensively modified for a non-maritime purpose, Hayford v. Doussony, 32 F.2d 605 (5th Cir. 1929), (old gunboat converted and refitted as amusement and dance barge).

In Evansville Co. v. Chero Cola Co., *supra,* Justice Butler observed that the wharf-boat there in question

> "performed no function that might not have been performed as well by an appropriate structure on the land and by a floating stage or platform permanently attached to the land." 271 U.S. at 22, 46 S.Ct. at 380.

This language was echoed by Circuit Judge Walker in Hayford v. Doussony, *supra,* where he found that the dance barge "performed no function that might not have been performed as well by a floating stage or platform permanently attached to the land." 32 F.2d at 605.

The Court is unable to find that the Star of India falls within the above language. For although she does house certain maritime artifacts that would warrant calling her a "museum" in the broadest sense of the term, her primary purpose and function lies in making

available to the public the most authentic replica possible of the great sailing ships that contributed to the development of the Western United States. In this regard, it is interesting to note that Mr. Reynard, who apparently handles the day to day supervision of the Star of India, apparently holds himself out to be her "Master." (Cf. correspondence dated March 18, 1969 from Mr. Reynard to the Coast Guard, attached to defendants' supporting affidavit.) In this Court's experience, museums are run by curators; ships are run by Masters. Furthermore, it can fairly be said that visitors to the Star of India do not pay admission merely to view the memorabilia collected below in a few glass cases, but they come aboard to enjoy the unique experience of trodding the decks and inspecting the lofty rigging of this old sea voyager. Obviously no floating stage or platform could similarly perform this important function of bringing to life a significant era of American history. The Court is convinced that the facts of this case more closely parallel that of The Showboat, 47 F.2d 286 (D. Mass.1930), wherein District Judge Morton considered the status of another retired sailing vessel in terms of the statutory definition in 1 U.S.C. § 3:

> "Of course each case depends on its particular facts; and structures shade off from what is obviously a vessel to what is obviously not. Here we have a five masted schooner, which, if the sails which are now on board were bent on, the booms being arranged to swing over the house, could go to sea; or she could be towed as she now is anywhere that a barge can be taken. She has a crew consisting of a licensed master or mate and two or three seamen. Her mooring lines and chains can be readily cast off; and the electric wires are so fitted as to be easily detachable. While her owners had not, at the time when the libel was filed, any present intention to use her for transportation purposes, I do not think that fact decisive. She was

still a 'vessel' in my opinion within the admiralty jurisdiction." 47 F.2d at 287.

In the instant case, also, this Court does not find the owner's present stated intention to be decisive. Even in her current stationary condition, it is evident that the Star of India's primary function is to serve as a ship and only secondarily to house various historical curios. Only a sister ship could serve in substitution. That is why the Star of India was saved from the scrap yard and that is why she was so carefully restored to her former glory. Were she presently slipped from her moorings, whether deliberately or by chance, she would undoubtedly be capable of engaging in maritime transportation, if only as a towed craft. Furthermore, there is no allegation that the Star could not be prepared, inspected and documented to proceed to sea on her own. We are reminded of the endeavors of men who have dared to navigate the oceans in far less seaworthy craft.

In sum, this Court is not convinced that the Star of India, in her present stated condition, does not supply the "maritime nexus" for this tort which admittedly occurred on navigable waters. Ships are the traditional source of admiralty jurisdiction and in view of the foregoing discussion the Court finds that the Star of India is a ship. By its efforts and conduct over the years the defendant Association has enhanced her status as a ship and has held her out as such, practically speaking. The fact that the Star currently rests at dockside detracts not at all from her colorful past nor her future capacities.

In view of the foregoing, it is the holding of this Court that the plaintiff's tort claim does lie within the admiralty jurisdiction of the federal courts.

## IV

The defendant Association has also moved to strike paragraph VII of the plaintiff's complaint on the grounds that it is immaterial. Rule 12(f), Federal

Rules of Civil Procedure. Paragraph VII alleges:

"That the defendants have the duty to furnish the plaintiff with a safe vessel and that the defendants failed to provide a safe vessel for the passengers, and more particularly, for the plaintiff."

 Insofar as the allegation implies that the plaintiff may avail herself of the doctrine of unseaworthiness, the Court is inclined to agree with the defendants that she is in error, since the warranty of seaworthiness extends only to crewmembers of the vessel and not to passengers or visitors. Kermarec v. Compagne Generale Transatlantique, 358 U.S. 625, 629, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959). In that case, Justice Stewart, speaking for a unanimous Court, stated the pertinent rule as follows:

"We hold that the owner of a ship in navigable waters owes to all who are on board for purposes not inimical to his legitimate interests the duty of exercising reasonable care under the circumstances of each case." 358 U.S. at 632, 79 S.Ct. at 410.

This is obviously a rather broad statement of the shipowner's duty. And it is impossible at this point in the proceedings to state that plaintiff could not prove, in the particular circumstances of the instant case, that the alleged duty of providing her a "safe" ship fell within that broad statement. Sitting in admiralty without a jury, this Court can readily make the necessary distinction between the absolute duty to provide a seaworthy ship to a crewmember and the more relative obligation owed a visitor, and thus no prejudice is likely to befall the defendant by allowing the allegations in question to remain. See 5 Wright and Miller, Federal Practice and Procedure: Civil, § 1382.

### ORDER

In view of the foregoing discussion and findings, it is accordingly,

Ordered that the Defendants' Motion to Dismiss on the ground of lack of subject matter jurisdiction be and the same is hereby denied; and

It is further ordered that the Defendants' Motion to Strike on the grounds of immateriality be and the same is hereby denied.