**Garland Wayne KELLY and Allen Eugene Kelly, Sr., Plaintiffs-Appellees,**

v.

**J. C. SMITH and Chicot Land Company, Inc., et al., Defendants-Appellants.**

No. 72-3285.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1973.

Rehearing and Rehearing En Banc Denied Nov. 19, 1973.

**521**

M. E. Ward, R. E. Parker, Jr., Vicksburg, Miss., J. Albert Lake, Greenville, Miss., for Anderson-Tully.

Before TUTTLE, GODBOLD and MORGAN, Circuit Judges.

GODBOLD, Circuit Judge:

This case arises from a mini ship-to-shore gun battle in the Mississippi River. The vessel, no ship of the line, is a 15-foot outboard boat. The combatants are irregular forces, fleeing deer poachers afloat and outraged defenders of a private hunting preserve ashore. The armament, rather than coastal batteries and carronades on the gun deck, consists of hunting rifles. The forces encountered one another as the result of actual, though unintended, aerial reconnaissance. The engagement commenced with solid shot—from a rifle—fired from shore across the bow of the boat to signal it to stop. It continued on course. The gunners ashore lowered their elevation and fired into the water beside the boat. The boat continued in flight at full speed ahead, and the next rounds were fired into the boat, holing the boat and wounding the man at the tiller, who was the senior man on board, and another. The force afloat, having suffered these serious casualties, dispatched a few rounds shoreward, broke off the engagement and retired from the scene in disarray. The land detachment won the battle but lost the lawsuit. We affirm.

The central issue is whether the tort claims of plaintiffs, casualties aboard the boat, are within admiralty jurisdiction. In addition, defendants-appellants contend that the court erred in failing to sustain their plea of laches to this 5½ year old cause of action and in finding Chicot Land Company vicariously liable for the actions of defendants Smith and Bledsoe.

On November 27, 1965 Allen Eugene Kelly, Sr. and his three sons, all residents of Mississippi, slipped across the Mississippi River to Woodstock Island in their 15-foot boat for a day of clandes-

O. C. Burnside, Jr., Lake Village, Ark., for J. C. Smith.

Roy D. Campbell, Jr., James L. Robertson, Lawrence D. Wade, Greenville, Miss., for Chicot Land Co.

Philip E. Henderson, Robert L. Morris, Houma, La., for Allen Kelly and Garland Kelly.

tine deer hunting. The island is located on the west side of the main channel. It is covered with timber and well stocked with wild game, especially deer. It was owned by Anderson-Tully Co., which had granted to Chicot Land Company, an Arkansas land management corporation, a license for exclusive hunting rights on the island. In return for the license Chicot paid a fee, maintained roads and fire lanes on the island, employed the caretaker, and assumed general responsibility for the well being of the island. Woodstock Hunting Club, the hunting rights licensee prior to Chicot, was an association formed to enjoy hunting on the island and to communally share the expenses of the license and hunting. Chicot succeeded to the hunting club's license because the club was unable to pay the annual rental regularly or to perform the necessary maintenance and construction on the island. After Chicot took over the license the club members continued to enjoy the hunting rights, and the club reimbursed Chicot for its expenses as the club members paid their dues. Defendant J. C. Smith, a resident of Arkansas, had been the caretaker of the island for its various owners since the 1930's. He was also the prime mover in organizing and running the hunting club.[1] At the time of the incident Smith was employed by Chicot to maintain its heavy construction equipment, and to serve as caretaker for the island.[2]

During the afternoon of November 27, 1965, Defendants Smith and Bledsoe were at the clubhouse on the island. Another club member flying a light airplane evidently sighted the Kellys' boat and dropped a note to Smith and Bledsoe informing them of the suspected poachers on the island. The Kellys, suspecting discovery, took to their boat in an attempt to flee. Simultaneously, Smith and Bledsoe rushed to where the note indicated the boat was docked. At that point the parties' stories diverge. The exchange of gunfire ensued. Smith and Bledsoe claimed that they signaled and yelled at the Kellys to return to the island in order to establish their identity and that the Kellys responded by shooting at them. The Kellys contended that Smith and Bledsoe fired first. The District Court found that Smith and Bledsoe initiated the firing, first across the bow of the vessel to indicate that it should stop, then into the water next to the boat. The Kellys continued at full speed to try to get out of range, and Kelly, Sr., indicated he would not return to the bank. The two men on shore then fired into the boat, striking Kelly, Sr., and Garland Wayne Kelly. One of the Kelly sons then fired his rifle at Smith and Bledsoe.

In early 1971 Kelly, Sr., and his injured son, Garland Wayne Kelly, filed suits for their injuries in federal district court against Smith, Bledsoe, Chicot, Anderson-Tully, and the members of the Woodstock Hunting Club, alleging diversity of citizenship and admiralty jurisdiction.[3] The District Court dismissed the Club on a motion for summary judgment.[4] After a nonjury trial the court concluded that despite the Kellys' status as trespassers, Chicot, Smith, and Bledsoe were jointly and severally liable to Kelly, Sr., for $69,772.40 and to Garland Wayne Kelly for $2,593.96. It found that Chicot was vicariously liable for Smith's actions under respondeat superior and for Bledsoe's actions because

---

1. The president of Chicot was a hunting companion of J. C. Smith and an officer and director of the Woodstock Hunting Club since its formation.

2. His duties as caretaker included the regulation and supervision of all hunts, the general care and maintenance of the clubhouse, keeping up the fire lanes and roads, making sure that an adequate food supply was available for the game, and keeping off all trespassers and poachers.

3. The incident spawned other litigation also. In 1968 a Mississippi state court had convicted and fined Smith and Bledsoe for criminal assault and battery. Also in 1968 the Kellys evidently brought suit against Smith and Bledsoe in an Arkansas court for damages to their boat.

4. That dismissal was not appealed.

Bledsoe was acting under the instructions and at the request of Smith to protect and defend Chicot's valuable hunting rights on the island. Anderson-Tully was absolved of liability because Smith and Bledsoe were not acting in its behalf. Integral to the District Court's decision were its conclusions that the cause of action was one in admiralty and that the Kellys were not barred by laches. Those are the issues on appeal, plus the issue of Chicot's vicarious liability. Defendants do not contest, under the clearly erroneous rule, the District Court's finding that Smith and Bledsoe were the aggressors, nor the conclusions that Smith and Bledsoe committed the intentional tort of assault and battery and that the force used in protecting Chicot's exclusive hunting rights was excessive.

### a. *Admiralty tort jurisdiction*

The issue of jurisdiction is crucial. If jurisdiction was sustainable only on diversity grounds the Kellys' *Erie*-bound claim was barred by the Mississippi one-year statute of limitations for assault and battery cases. Miss.Code Ann. § 732.[5]

Historically the standard for determination of maritime tort jurisdiction was viewed as a question of the locality of the tort. Maritime law governed only those actions where the "substance and the consummation of the injury" took place on navigable waters. The Plym-

outh, 70 U.S. (3 Wall.) 20, 33, 18 L.Ed. 125, 127 (1886). The strict locality standard was perfunctorily repeated with such frequency[6] that most courts seemingly lost track of the failure of the Supreme Court to explicitly decide whether maritime tort jurisdiction turned solely on maritime locality. In Atlantic Transport Co. v. Imbrovek, 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914), a case involving injuries sustained by a stevedore on board a vessel while loading copper, the Court upheld federal admiralty jurisdiction but explicitly found it unnecessary to consider whether maritime locality alone was sufficient. The Court did not address the question directly again until 1972.[7] In Executive Jet Aviation v. Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), plaintiff's plane lost power from ingesting seagulls into its engines while taking off from defendant's airport and came to rest and sank off the end of the runway in Lake Erie. Plaintiff sued in admiralty, alleging that defendant negligently failed to keep its runway free of seagulls or to warn of their presence. The Court of Appeals found that the tort occurred on land, therefore the case was not cognizable in admiralty. Executive Jet Aviation, Inc. v. City of Cleveland, 448 F.2d 151, 154 (CA6, 1971). But the Supreme Court faced the broader question of whether maritime locality alone is sufficient to create admiralty tort jurisdiction.

---

5. The shifting of the river channel has created extensive litigation concerning the precise location of the Arkansas-Mississippi boundary, Anderson-Tully Co. v. Walls, 266 F.Supp. 804 (N.D.Miss.1967) ; Arkansas Land & Cattle Co. v. Anderson-Tully Co., 248 Ark. 495, 452 S.W.2d 632 (1970) ; Mississippi v. Arkansas, 403 U.S. 951, 91 S.Ct. 2273, 29 L.Ed.2d 862 (1971), but the parties to this action agreed that the incident in this case occurred in Mississippi.

6. Grant Smith-Porter Ship Co. v. Rohde, 257 U.S. 469, 42 S.Ct. 157, 66 L.Ed. 321 (1922) ; State Indust. Comm. v. Nordenholt Corp., 259 U.S. 263, 42 S.Ct. 473, 66 L.Ed. 933 (1922) ; Victory Carriers v. Law, 404

U.S. 202, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971) (see exhaustive list of cases in fn. 2) ; Penn Tanker Co. v. United States, 409 F.2d 514 (C.A.5, 1969) ; 7A Moore, Federal Practice, Admiralty ¶ .325 [3] (2d ed. 1972).

7. Despite the general acceptance of the strict locality standard, a small line of cases recognized that *Imbrovek* had left the question open. The Raithmoor, 241 U.S. 166, 36 S.Ct. 514, 60 L.Ed. 937 (1916) ; The Poznan, 276 F. 418 (S.D.N.Y.1921) ; Sidney Blumenthal & Co. v. United States, 30 F.2d 247 (C.A.2, 1929) ; Kermarec v. Compagnie Generale Translantique, 245 F.2d 175 (C. A.2, 1957).

In the factual context of *Executive Jet* the Court declared:

> . . . the mere fact that the alleged wrong "occurs" or "is located" on or over navigable waters—whatever that means in an aviation context—is not of itself sufficient to turn an airplane negligence case into a "maritime tort." It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. . . .

409 U.S. at 268, 93 S.Ct. at 504, 34 L. Ed.2d at 467.

In reaching its decision about airplane negligence cases the Court pointed out that

> . . . there has existed over the years a judicial, legislative, and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more consonant with the purposes of maritime law than is a purely mechanical application of the locality test.

Id. at 249, 93 S.Ct. at 501, 34 L.Ed.2d at 463.

Foreshadowing the Supreme Court's analysis and conclusion in *Executive Jet*, this court recognized the inadequacies of the strict locality test in Watz v. Zapata Off-Shore Co., 431 F.2d 100, 109–111 (CA5, 1970). And in Peytavin v. Government Employees Ins. Co., 453 F.2d 1121 (CA5, 1972), we concluded that the facts and circumstances of each claim must have a substantial connection with maritime activities or interests in order to invoke the admiralty jurisdiction of the federal courts.[8]

■ The analysis and thrust of *Executive Jet*, coupled with our decision in *Peytavin*, dictate the conclusions that maritime locality alone is no longer sufficient to sustain maritime jurisdiction,[9] and that the wrong must bear a significant relationship to maritime activity.

In *Executive Jet*, *Peytavin*, and *Watz*, the courts presented and analyzed the rationale for adopting significant relationship to maritime activity as a requirement for admiralty jurisdiction. The strict locality test suffered from a susceptibility to mechanical application and from a tendency to create inconsistent results in cases otherwise conceptually analogous. In Smith & Son v. Taylor, 276 U.S. 179, 48 S.Ct. 228, 72 L. Ed. 520 (1928), a longshoreman knocked from a wharf into the water by a sling being lowered from a vessel had remedies only under state law, while in Minnie v. Port Huron Term. Co., 295 U.S. 647, 55 S.Ct. 884, 79 L.Ed. 1631 (1935), the longshoreman who was standing on the vessel and knocked onto the wharf had federal law remedies. Another problem engendered by the strict locality rule was determination of where the tort

---

8. Sporadically other cases had adopted this view. Chapman v. Grosse Pointe Farms, 385 F.2d 962 (C.A.6, 1967); McGuire v. New York, 192 F.Supp. 866 (S.D.N.Y.1961); Smith v. Guerrant, 290 F.Supp. 111 (S.D. Tex., 1968); Campbell v. Hackfield & Co., 125 F. 696 (C.A.9, 1903). *Cf.* Gowdy v. United States, 412 F.2d 525 (C.A.6, 1969); Davis v. Jacksonville Beach, 251 F.Supp. 327 (M.D.Fla.1965); King v. Testerman, 214 F.Supp. 335 (E.D.Tenn.1963); Petersen Coal & Oil Co. v. United States, 323 F. Supp. 1198 (N.D.Ill.1970); O'Connor & Co. v. Pascagoula, 304 F.Supp. 681 (S.D.Miss. 1969); Hastings v. Mann, 226 F.Supp. 962 (E.D.N.C.1964), aff'd 340 F.2d 910 (C.A.4, 1965). The English courts adopted the same view. The Queen v. The Judge of the City of London Court, 1 QB 273 (1892). See also, 7A Moore, Federal Practice, Admiralty ¶ .325 [3]–[5] (2d ed. 1972); Black, Admiralty Jurisdiction; Critique and Suggestions, 50 Colum.L.Rev. 259 (1950); ALI, Study of the Division of Jurisdiction Between State and Federal Courts (1969).

9. If indeed locality alone actually ever was sufficient. As noted in Smith v. Guerrant, 290 F.Supp. 111, 112 fn. 4, (S.D.Tex.1968), in the cases where the Supreme Court most unequivocally set out the strict locality rule the relation between the dispute and maritime commerce was manifest. State Indust. Comm. v. Nordenholt Corp., supra; Grant Smith-Porter Ship Co. v. Rohde, supra.

occurred. See the Sixth Circuit's opinion in *Executive Jet, supra.* Indeed courts often equated injury with the broader concept of tort, which encompasses not only injury but causation and considerations of public policy. In 1948, as a result of cases which held that injury to property on land caused by vessels on navigable streams was not a maritime tort, e. g., *The Plymouth, supra,* Congress adopted the Extension of Admiralty Act, 46 U.S.C. § 740. See, Black, Admiralty Jurisdiction; Critique and Suggestions, 50 Colum.L.Rev. 259 (1950); 7A Moore, Federal Practice, Admiralty ¶ .325 [4].

■ The District Court found that the stretch of the Mississippi River where the Kellys were injured was navigable. The evidence of navigability, including testimony by a tugboat captain who regularly traveled that stretch, is sufficient to support the court's finding, and it is not clearly erroneous. Rule 52(a), F.R.Civ.P.; McAllister v. United States, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); Chaney v. City of Galveston, 368 F.2d 774 (CA5, 1966).

However, in this case admiralty jurisdiction does not arise from the bare facts that the Kellys' injury was consummated on navigable waters while they were in a boat. While those facts weigh towards maritime jurisdiction, we must look to all the circumstances for a substantial maritime relationship. Both *Peytavin* and *Executive Jet* offer guidelines for the determination.

The incident in *Peytavin* was a rear-end car collision on a floating pontoon used for loading and unloading a ferry, which resulted in a whiplash neck and back injury to plaintiff. The court, admitting that both parties were using facilities which were connected to maritime commerce, focused on the relationship to maritime activities or interests of the parties, the nature and apparent cause of the accident, and the injury sustained. Finding that a rear-end collision between terrestrial vehicles, operated by landlubbers, and resulting in a

typical automobile traffic accident injury lacked sufficient maritime flavor, we concluded that admiralty jurisdiction was absent. 453 F.2d at 1126.

In *Executive Jet,* the Court recognized that superficial similarities may exist between the plights of sinking ships and airplanes downed on water but pointed out that " . . . the plane's unexpected descent will almost invariably have been attributable to a cause unrelated to the sea. . . ." The Court also stressed the inherent differences between water and air transportation and said:

> [Admiralty] [r]ules and concepts . . . are wholly alien to air commerce, whose vehicles operate in a totally different element, unhindered by geographical boundaries and exempt from the navigational rules of the maritime road. The matters with which admiralty is basically concerned have no conceivable bearing on the operation of aircraft over land or water.

409 U.S. at 270, 93 S.Ct. at 505, 34 L. Ed.2d at 468. The Court did not decide whether an aviation tort could ever bear a "sufficient relationship to traditional maritime activity to come within admiralty jurisdiction . . .," and indeed it suggested that an aircraft performing a function traditionally performed by waterborne vehicles might bear a sufficient relationship. 409 U.S. at 270, 93 S.Ct. at 505, 34 L.Ed.2d at 469. See, e. g., Hornsby v. Fishmeal Co., 431 F.2d 865 (CA5, 1970) (mid-air collision of light aircraft used in spotting schools of fish); Hark v. Antilles Airboats, Inc., 355 F.Supp. 683 (D.V.I., 1973) (seaplane crash).

■ From the facts and analysis of *Executive Jet* and *Peytavin* we can discern factors to be considered in the circumstances before us: the functions and roles of the parties; the types of vehicles and instrumentalities involved; the causation and the type of injury; and traditional concepts of the role of admiralty law.

The party most seriously injured was the pilot, the person responsible for the

526

safe navigation of the river. The vehicle involved was a boat, not an automobile or airplane, whose function was transportation across navigable waters, a traditional role of watercraft.[10]

The other instrumentalities involved—firearms—and the injuries they caused, are not so inherently indigenous to land as to preclude any maritime connection. Additionally, upholding admiralty jurisdiction does not stretch or distort long evolved principles of maritime law. Admiralty has traditionally been concerned with furnishing remedies for those injured while traveling navigable waters.

■■ Policy militates toward admiralty jurisdiction in this case. The admiralty jurisdiction of federal courts stems from the important national interest in uniformity of law and remedies for those facing the hazards of waterborne transportation. Rifle fire directed at a vessel, albeit a small one, on a major commercial artery, and injuring the pilot, presents sufficient danger to maritime commerce for the federal courts of admiralty to assume jurisdiction and to furnish remedies to those aboard the vessel and injured by that conduct. Regardless of whether the Kellys had available remedies in state courts, the federal interest in protecting navigation on the Mississippi River overrides any considerations of federal-state comity or conflicts of interest.

### b. Laches

■■ In Watz v. Zapata Off-Shore Co., *supra,* and Powell v. City of Key West, 434 F.2d 1075 (CA5, 1970), we discussed the interrelated and often overlapping elements, excuse for delay and prejudice to the defendant, that bear on whether a long-delaying plaintiff is time-barred. *See also,* McMahon v. Pan American World Airways, Inc., 297 F.2d 268 (CA5, 1962); Molnar v. Gulfcoast Transit, 371 F.2d 639 (CA5, 1967); Akers v. State Marine Lines,

344 F.2d 217 (CA5, 1965). The Kellys were diligent in seeking to bring this suit, but, the court found, were thwarted by the failure of reputable law firms to diligently represent them. The District Court found that the delay by the Kellys in bringing the suit was justifiable, and that defendants suffered no prejudice, in fact were aided by the delay. An unknown witness became available to defendants after the running of the Mississippi statute of limitations. The trial judge enjoys a wide area of discretion in ruling on a claim of laches, Powell v. City of Key West, *supra,* and we cannot say that he exceeded it in this case.

### c. Chicot's vicarious liability

■ Although some evidence suggests that Chicot lacked substantial control over Smith's activities on the island, there is sufficient evidence indicating that Smith was indeed acting as an agent protecting Chicot's interests on the island to warrant the finding of vicarious liability. The conclusion that Bledsoe was acting to protect Chicot's interest under the instructions of Smith also finds sanctuary in the plainly erroneous rule.

Affirmed.

MORGAN, Circuit Judge (dissenting):

In spite of the beacon provided by the Supreme Court in Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), the majority seems to have run aground on the rocks of admiralty jurisdiction. Had I been in command, I would have charted our course differently by holding that the federal courts have no jurisdiction over this cause of action.

After years of intellectual erosion, the "pure locality" test for admiralty jurisdiction has been washed to sea. Since *Executive Jet,* a condition of admiralty

10. *Compare,* Adams v. Montana Power Co., 354 F.Supp. 1111 (D.Mont.1973) (negligent operation of a recreational boat on a land-locked fishing and skiing lake); see, Stolz, Pleasure Boating and Admiralty, 51 Calif. L.Rev. 661 (1963).

tort jurisdiction is that "the wrong bear a significant relationship to traditional maritime activity." 409 U.S. at 268, 93 S.Ct. at 504, 34 L.Ed.2d at 467. Everyone agrees that "locality plus" is the test in this case,[1] but we are still faced with the question, "locality plus what?" The majority holds that, "we must look to all the circumstances for a substantial maritime relationship." I agree with them that the important considerations are the functions and roles of the parties, the types of vehicles and instrumentalities involved, the causation and type of injury and the role of admiralty law.

But an additional consideration is present when assertion of admiralty jurisdiction involves a potential conflict with applicable state law. Such a conflict exists here, because state rules also govern these events. Even if brought in federal court on diversity grounds, the state substantive law, including its statute of limitations, would apply. Ragan v. Merchants Transfer & Warehouse Co., Inc., 337 U.S. 530, 69 S.Ct. 1233, 93 L. Ed. 1520 (1949). Thus, by asserting admiralty jurisdiction, we effectively deprive the state of its control over this cause of action. Such deprivation is justified in many cases, but only if the federal interest in uniformity outweighs the other interests at stake.

In this sense our analysis of the admiralty clause of the Constitution can be analogized to be now well-developed body of case law interpreting Erie R. Co. v. Tompkins. See Byrd v. Blue Ridge Rural Electric Cooperative, 356 U.S. 525, 78 S.Ct. 893, 2 L.Ed.2d 953 (1958), Hanna v. Plumer, 380 U.S. 460, 85 S.Ct. 1136, 14 L.Ed.2d 8 (1965) (Harlan, J. concurring) and Szantay v. Beech Aircraft Corporation, 349 F.2d 60 (4 Cir. 1965).

Using this type of analysis, we must examine the relevant federal and state interests in this case to see which is more important. The State of Mississippi has a strong interest in the outcome. This is shown by the fact that state substantive rules would apply if the case were based on diversity jurisdiction, by the existence of a state criminal penalty for the actions of some of the parties, and the local nature of the tort of assault and battery. The local nature of the incident is further emphasized by imagining a case in which the terrestrial, as opposed to maritime, participants in this battle were injured, and sued their attackers. Essentially, that case is the same as the one we are called upon to decide, yet the assertion of admiralty jurisdiction in the hypothetical would be a gross overextension of federal power into areas of local concern.

The federal interest, on the other hand, is minimal. The majority states that rifle fire directed at a vessel presents a danger to maritime commerce which the federal courts ought to recognize. But this language obscures the facts of this case. Mr. Kelly and his cohorts used a 15-foot boat to sneak across the Mississippi River onto Woodstock Island to engage in poaching. There is simply no overriding federal interest in protecting such conduct. This is not to say that trespassers should not be protected against over-reaction by their victims. But the extent to which they should be protected is a matter of purely local concern, not of federal concern. The law of admiralty has purely commercial origins and purposes. Its usefulness is derived from the strong federal interest in controlling interstate and foreign commerce on water, and in fashioning a body of rules to govern the unique (sometimes uniquely hazardous) aspects of waterborne transportation. Watz v. Zapata Off-Shore Co., 431 F.2d 100 (5 Cir. 1970). The complex and peculiar rules of admiralty are particularly suited for deciding suits arising out of "traditional maritime activities, involv-

---

1. The progeny of *Executive Jet* may abandon the requirement of a maritime locality altogether, and physical location will be only one factor in the equation. But since the district court found that this tort occurred in navigable waters, and that finding is not clearly erroneous, we are not faced with that question.

ing navigation or commerce on navigable waters." Executive Jet Aviation v. Cleveland, 409 U.S. at 256, 93 S.Ct. at 498, 34 L.Ed.2d at 460. In particular, one of the essential characteristics of admiralty jurisdiction is its uniformity, providing predictable and constant relationships between parties engaged in maritime activities. Moragne v. States Marine Lines, Inc., 398 U.S. 375, 90 S. Ct. 1772, 26 L.Ed.2d 339 (1970). But uniformity is hindered, not advanced by the majority's decision in this case. A slight change in physical location would have produced entirely different results. The plaintiffs had no reasonable expectation as to which substantive law would be applied to their actions. No federal interest would be served by extending the admiralty rules to cover their activities, and, as shown above, significant state interests would be abrogated.

For these reasons, I believe that no admiralty jurisdiction exists over this case, and I must respectfully dissent.