CLINTON BOARD OF PARK COMMISSIONERS, and owner of the VESSEL RHODODENDRON, Plaintiffs,

v.

Margaret Foster CLAUSSEN, Individually and as Administrator of the Estate of William T. Foster, Jr., a Deceased Minor, and William T. Foster, Individually, Defendants.

Civ. No. 75–44–D.

United States District Court, S. D. Iowa, Davenport Division.

April 7, 1976.

---

Harold L. Witsaman (Ray, Robinson, Keenen & Hanninen), Chicago, Ill., Thomas N. Kamp (Lane & Waterman), Davenport, Iowa, for plaintiffs.

Warren C. Johnson, Paul E. Pfeffer, Clinton, Iowa, for defendants.

## ORDER

STUART, District Judge.

The Clinton County Board of Park Commissioners brings this action seeking to invoke federal admiralty jurisdiction in order to claim the benefits of 46 U.S.C. §§ 183–189 which can be used in appropriate situations to limit the liability of a vessel owner in maritime tort actions. Defendants have answered the complaint and have moved therein to dismiss the cause for lack of proper admiralty jurisdiction. Although defendants' motion is enmeshed with their answer and not set forth in a separate pleading the parties understand that a jurisdictional attack is being made. Plaintiff has filed a response addressing the salient issues. For reasons to be stated hereafter the Court finds admiralty jurisdiction to be lacking in this case.

For the purposes of ruling on the motion the following facts are accepted as true.

The present suit is an outgrowth of a mishap involving the showboat "Rhododendron" occurring on or about June 5, 1975, which resulted in the drowning of

an eleven year old child, William T. Foster, Jr. The Rhododendron is a vessel originally constructed as a sternwheel river towboat in the 1930's but subsequently converted into a showboat and nautical museum. In 1966, it was purchased by the Clinton Board of Park Commissioners and brought to Clinton, Iowa.

In the summer the Rhododendron is moored alongside the west bank of the Mississippi River, but during winter months she is moved upstream about one-quarter mile into "Joyce Slough", a body of water connected to the Mississippi. On June 5, 1975, the Rhododendron was being shifted by tugboat from her winter mooring to her summer mooring. Before departure from the winter mooring area, a four foot by eight foot styrofoam float used to reach shore was disconnected from the aluminum gangway which was pulled aboard the showboat. The float was then tied to steps built into the dock and the Rhododendron was towed away. Five minutes after William T. Foster Jr., age 11, began fishing from the float, it became unsecured from the shore and began to drift downstream. The child panicked, jumped into the river, and was drowned.

A wrongful death action on behalf of the decedent and separate actions on behalf of the mother and father of the child have been filed in the Iowa district courts. The factors involved in the boy's death were allegedly either "(1) the failure of park commission employees to place the platform on shore at the time it was taken from the approach to the Rhododendron at 9th Avenue North and before any movement thereof; or (2) the failure of the Park Board employees to securely fasten the platform so as to prevent it from separating from the shore and moving into the current so as to frighten the child".

In the instant action, plaintiff claims these facts subject this cause of action to the admiralty jurisdiction of this Court and seeks to avail itself of certain federal admiralty statutes limiting its liability.

For many years it was widely held by the federal courts that admiralty jurisdiction will be found to exist upon the sole finding that the tort occurred upon navigable waters. See The Plymouth (1865), 3 Wall. 20, 70 U.S. 20, 18 L.Ed. 125. Recent cases, however, have signaled a retreat from this "locality test" to require something more than mere maritime locality. The United States Supreme Court approved of this trend in *Executive Jet Aviation Inc. v. City of Cleveland* (1972), 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454. In that case plaintiff's airplane lost its power while taking off from the defendant's airport after ingesting seagulls into its engines, and crashed into Lake Erie, a navigable body of water. Justice Stewart made the following observation regarding the locality test:

> [T]here has existed over the years a judicial, legislative, and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test. *Id.* at 261, 93 S.Ct. at 501, 34 L.Ed.2d at 463.

> It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity. *Id.* 409 U.S. at 268, 93 S.Ct. at 504, 34 L.Ed.2d at 467.

Finding no such maritime nexus present there, the Court held there was no admiralty jurisdiction.

■ Differing opinions concerning the current status of the locality test have followed in the wake of the *Executive Jet* decision, but the Eighth Circuit in *St. Hilaire Moye v. Henderson* (8th Cir., 1974), 496 F.2d 973, has interpreted the significance of that case as follows:

> The strict locality test for admiralty has thus been extensively altered. An accident must now involve a traditional maritime activity to sustain admi-

ralty jurisdiction. Thus, the question of whether admiralty jurisdiction existed * * * depends on whether the accident arose out of "traditional maritime activity." 496 F.2d at 977. To sustain jurisdiction in the instant case, this Court will then apply the newer "locality-plus" test and require not only that the tort occur on navigable waters, but the wrong must be found to bear a "significant relationship to traditional maritime activity".

## Navigable Waters

The current federal test for "navigability" as an element of admiralty jurisdiction is rooted in the formulation set forth in *The Daniel Ball* (1870), 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999:

> Those rivers must be regarded as public navigable rivers in law, which are navigable in fact. And they are navigable in fact when they are used or susceptible of being used, in their ordinary condition, as highways for commerce, over which trade or travel are or may be conducted in the customary modes of trade and travel on water.

Refinement of the test announced in *The Daniel Ball* appears in *The Montello* (1874), 87 U.S. (20 Wall.) 430, 22 L.Ed. 391, wherein the Court stated that:

> * * * the true test does not depend on the mode by which commerce is, or may, be conducted, nor the difficulties attending navigation * * *.

The capability of the use by the public for purposes of transportation and commerce affords the true criterion of the navigability of the river, rather than the extent and manner of that use. *Id.* at 441.

More recently the Supreme Court has further held that even where a body of water is not passable in its natural and ordinary condition, if, by "reasonable" improvements it may be rendered navigable, then the body of water is "navigable" without such improvements. *United States v. Appalachian Electric Power Co.* (1940), 311 U.S. 337, 61 S.Ct. 291, 85 L.Ed. 293.

In accordance with the foregoing guidelines, this Court finds that Joyce Slough, a waterway connected at its north and south ends to the Mississippi River, is a navigable body of water. The shifting of the 581 ton Rhododendron to and from locations within Joyce Slough by harbor tugs drawing approximately six feet of water amply demonstrates its navigability, or at least sufficiently attests to its navigational capabilities so as to be considered "navigable" within the jurisdictional sense of the word.

## Maritime Nexus

In establishing the required maritime nexus, courts have accorded substantial weight to a finding that "vessels" occupied operative roles in the tortious occurrence. See *Kelly v. Smith* (5th Cir., 1973), 485 F.2d 520; *St. Hilaire Moye v. Henderson,* supra; and *Luna v. Star of India* (S.D.Cal., 1973), 356 F.Supp. 59. In *Luna* the Court concluded that a merchant vessel standing moored in a bay and maintained solely as a maritime museum was entitled to "vessel" status for purposes of general admiralty jurisdiction. Such a finding was based upon the statutory definition of the term found in 1 U.S.C. § 3:

> The word "vessel" includes every description of water craft or other artificial contrivance used, or capable of being used, as a means of transportation on water.

This Court sees little distinction between *Luna* and the instant case on this point and therefore holds that the Rhododendron is in fact a "vessel" within the broad definition of the term. Clearly, it is "capable of being used, as a means of transportation on water". However, the Court does not believe, as in *Luna*, that the jurisdictional issue is thereby resolved, but feels the better course is to regard such a finding as one of several factors to consider in the overall jurisdictional formula. See *Kelly* and *St. Hilaire Moye,* both supra.

Defendants attempt to disassociate the flotation platform from the operation of

the Rhododendron; however, the Court is inclined to believe that such an analytical separation is unjustified. The alleged negligent acts were occasioned by the movement of the showboat from its winter mooring to its summer mooring. Had the showboat not been so shifted, the mishap would presumably not have happened as it did. Furthermore, the float was utilized as a necessary component of the Rhododendron's gangway to provide access to the shore, and is in this respect directly related to the operation and maintenance of the vessel. Thus, the flotation platform and the alleged negligent acts relative thereto cannot, in the Court's view, be disassociated from the movement and operation of the Rhododendron itself.

An examination of the parties involved and their corresponding need for resort to the principles of maritime law is yet another factor to be weighed in the ultimate decision to accept admiralty jurisdiction. See *Kelly* and *St. Hilaire Moye*, supra. This action originated when, it is alleged, a small boy jumped in fear from a flotation platform which became unsecured as a result of the negligence of the Board's employees. It would not be to the claimants' advantage to redress their claims in admiralty. The Death on the High Seas Act, 46 U.S.C. §§ 761–767, is by its terms inapplicable to this situation, nor is there a need in this case for such other admiralty advantages as liberalized service of process and venue requirements, and the avoidance of choice of law problems. See 7A J. Moore, Federal Practice ¶ .325[1] (1972).

On the other hand, it is also a tenable position that vessels which leave their moorings inadequately securing a gangway float in their departure are entitled to the protection of federal admiralty rules. Plaintiff in the instant action seeks to limit its liability arising from the drowning incident by invoking the operation of 46 U.S.C. § 183 et seq. Those sections are made applicable to:

* * * all seagoing vessels, and also to all vessels used on lakes or rivers or in inland navigation, including canal boats, barges, and lighters. 46 U.S.C. § 188.

Essentially, courts have construed the definition of vessel for limitation of liability purposes to be coextensive with the general statutory definition found in 1 U.S.C. § 3, set forth above. See 7A J. Moore, Federal Practice ¶ .215[5]. Thus, as the Court has found the Rhododendron to be properly within the broad definition of 1 U.S.C. § 3, it follows that, assuming the existence of maritime jurisdiction, the owner thereof is free to invoke the liability limitation advantages the admiralty rules are designed to provide, and attempt to limit its exposure to various claims arising from the drowning mishap. It would be to the owner's advantage if maritime jurisdiction could be invoked.

Looking to the parties involved, and their corresponding relationship to maritime activities or interests the Court is faced with conflicting positions. One party is clearly not in need of the various rules and concepts designed to govern matters of a truly maritime character; however, the other party, would benefit from the application of admiralty jurisdiction. Under these circumstances, the Court believes that the traditional concepts of the role of admiralty must be examined and applied to this case as a whole to provide the decisive element in determining maritime nexus.

"Maritime activity" has generally been discussed in terms of its interdependence with the historical justification of a federal admiralty jurisdiction. Mr. Justice Stewart in *Executive Jet* described the development of admiralty law in the following terms:

The law of admiralty has evolved over many centuries, designed and molded to handle problems of vessels relegated to ply the waterways of the world, beyond whose shores they cannot go. That law deals with navigational rules—rules that govern the manner and direction those vessels may rightly move upon the waters. When a colli-

sion occurs or a ship founders at sea, the law of admiralty looks to those rules to determine fault, liability, and all other questions that may arise from such a catastrophe. Through long experience, the law of the sea knows how to determine whether a particular ship is seaworthy, and it knows the nature of maintenance and cure. It is concerned with maritime liens, the general average, captures and prizes, limitation of liability, cargo damage, and claims for salvage. 409 U.S. at 269, 93 S.Ct. at 505, 34 L.Ed.2d at 468.

Maritime activity thus usually comprehends matters which tend to vindicate the objectives of a separate body of admiralty law, such as maritime service, navigation and commerce. *Rubin v. Power Authority of State of New York* (W.D.N.Y., 1973), 356 F.Supp. 1169.

In *Onley v. South Carolina Electric and Gas* (4th Cir., 1973), 488 F.2d 758, a case involving a suit for injuries sustained when the plaintiff struck a submerged boat ramp after diving into a navigable body of water, the court focused upon this type of reasoning in finding the claim not cognizable in admiralty:

> We hold that appellee's control of the water level of a lake for the purpose of generating electricity, which results in a diving accident, does not bear a sufficiently significant relationship to traditional maritime activity to create federal admiralty jurisdiction. While the control of the water level of a navigable waterway may, in some cases, have an intimate relationship with maritime activities, there is no such maritime connection where a diving accident is the only consequence. The uniform body of rules and the expertise of admiralty are irrelevant to the issues in a diving accident. Conversely, the state tort law is most directly concerned with such accidents, and is quite capable of resolving the present controversy without any effect on the federal interest in maritime activities. *Id.* at 760.

Similarly, the negligent securing of a flotation platform, may, in some cases, be intimately related to maritime activities. However, under the circumstances present here it can be persuasively urged that a maritime nexus is wanting. This matter was originally instituted as, and still remains, a typical wrongful death action which the Iowa tort law is clearly competent to resolve.

Other courts, following the lead established by *Executive Jet,* have also focused upon the original purpose of admiralty law to deny or accept jurisdiction. In declining to hear an action for injuries sustained by a water skier skiing in navigable waters, the Fourth Circuit (per Haynsworth, J.) heavily considered the historical aspects of admiralty to find such matters not within the jurisdiction of the court:

> The admiralty jurisdiction in England and in this country was born of a felt need to protect the domestic shipping industry in its competition with foreign shipping, and to provide a uniform body of law for the governance of domestic and foreign shipping, engaged in the movement of commercial vessels from state to state and to and from foreign states. *Crosson v. Vance* (4th Cir., 1973), 484 F.2d 840, 840.

The Court cannot conceive how the incident at bar satisfies the stated jurisdictional test when the historical underpinnings of admiralty law are considered. Neither party here can be said to have been involved in maritime navigation or commerce in the true admiralty sense, nor in the Court's opinion does any aspect of this matter relate in a significant way to the original concepts of federal admiralty law. The Court has difficulty accepting the notion that principles developed to govern the domestic shipping industry and to provide a uniform body of sea-related jurisprudence should be applied to what is essentially a wrongful death action clearly capable of efficient adjudication by state tort law. Policies underlying the maritime law would be neither enhanced nor fulfilled by accepting jurisdiction of this controversy, nor

would resolution in the state courts do violence to the federal interests of uniformity and perpetration of the maritime industry.

In the Court's opinion, this case is conceptually akin to those involving water skiers. See *Crosson v. Vance, supra.* The court in *Crosson* found no maritime nexus existing where a water skier sustained injuries resulting from the alleged negligence of the tow boat operator, despite the obvious presence of a "vessel" and the potential for disruption of maritime commerce and navigation by interference with other boats on the river. The *Executive Jet* court apparently approves of this result when they cite *King v. Testerman* (E.D.Tenn., 1963), 214 F.Supp. 335 as exemplifying the following observation 409 U.S. at p. 255–56, 93 S.Ct. at 498, 34 L.Ed.2d at 460:

> * * * some courts have adhered to a mechanical application of the strict locality rule and have sustained admiralty jurisdiction despite the lack of any connection between the wrong and traditional forms of maritime commerce and navigation.

In *King,* admiralty jurisdiction was sustained on facts virtually indistinguishable from those in *Crosson.*

■ The Rhododendron engages in no commercial enterprise of a truly maritime nature and its "navigation" is very limited and infrequent on a body of water away from the main channel of the Mississippi. Moreover, when this incident occurred neither party was employed nor engaged in an activity which could be characterized as maritime. The Court therefore holds, as in *Crosson,* that when all the surrounding factors are considered, the overall tenor of this matter is substantially non-maritime. Admiralty jurisdiction will be denied.

■ The decision the Court reaches today is further buttressed by an examination of the purposes underlying the liability limitation statutes, 46 U.S.C. §§ 183–189, plaintiff seeks to utilize. These sections were enacted to promote building of ships and to encourage the

business of navigation, and should be applied with regard to such purpose. *Evansville and Bowling Green Packet Co. v. Chero Cola Bottling Co.* (1926), 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805. Limiting the liability of the owners of a converted showboat in a non-maritime related drowning death was obviously not the kind of situation contemplated by these sections.

IT IS HEREBY ORDERED that defendants motion to dismiss for lack of admiralty jurisdiction be, and hereby is, granted.