Lloyd W. HERTZ, III

v.

**TREASURE CHEST CASINO, L.L.C., et al.**

No. Civ.A. 03–73.

United States District Court, E.D. Louisiana.

July 25, 2003.

---

Ricahrd Anthony Weigand, Weigand & Levenson, New Orleans, LA, for Plainiff.

Pater B. Tompkins, James Melvin Jacobs, Murphy, Rogers & Sloss, New Orleans, LA, for Defendant.

### ORDER & REASONS

FALLON, District Judge.

Before the Court are the following motions: (1) motion of the plaintiff Lloyd Hertz ("Hertz") for partial summary judgment on the issue of Jones Act seaman status; and (2) motion of defendants for summary judgment on the basis that the TREASURE CHEST casino is not a vessel in navigation as a matter of law. For the following reasons, the Court DENIES the plaintiff's motion for partial summary judgment and GRANTS the defendants' motion.

## I. FACTS:

Plaintiff Hertz was employed as a captain aboard the TREASURE CHEST riverboat casino and on October 1, 2002 was injured in the course and scope of his employment while removing carpet from the deck of the casino. He claims he was injured because he was provided improper

tools with which to do his assigned tasks. Plaintiff alleged that at the time of his injury the TREASURE CHEST was a vessel in navigation and he was a member of the crew, entitling him to remedies against his employer and the vessel under the Jones Act, 46 U.S.C.App. § 688, and the general maritime law. Defendant claims the TREASURE CHEST was not a vessel in navigation at the time of the plaintiff's injury, precluding recovery under the Jones Act. Alternatively, the plaintiff argues that he has a cause of action for negligence under the general maritime law. Defendant, however, contests the existence of this Court's admiralty jurisdiction to hear such a dispute. A brief review of the features of the TREASURE CHEST, as well as it history, is necessary to understand the parties' arguments in the present motions.

The TREASURE CHEST has the following physical features: a steel hull, raked bow, bilge pumps, ballast tanks, generator, self-propelled engine, navigational aids, crew quarters, an operative pilot house, steering mechanism, life saving devices, and a navigational crew. It began operations in Lake Pontchartrain in September, 1994. From that point until March 31, 2001, the TREASURE CHEST was required to and did make daily cruises, weather permitting, for 90 minutes out of every three hours of operations. At that time, the TREASURE CHEST was clearly a vessel in navigation, and the members of the crew were seamen under the Jones Act. *See Williams v. Treasure Chest Casino,* 1998 A.M.C. 1300 (E.D.La. 1998) (finding that plaintiffs had stated a cause of action under the Jones Act and General Maritime Law based on alleged claims of sexual harassment).

However, on April 1, 2001, the Louisiana statute regulating gaming aboard riverboat casinos was amended to provide that with regard to a riverboat casino located in Jefferson Parish "gaming may only be conducted on a riverboat while it is docked and the licensee shall not conduct cruises or excursions." LA.REV.STAT. Ann. § 27:65(c). *See also* LA.REV.STAT. Ann. §§ 27:65, 66 & 91 (West Supp.2002).

Since April 1, 2001, the TREASURE CHEST has been moored to the floating barge that serves as the dock. One of the TREASURE CHEST's captains testified by deposition that before the amendments the boat was secured by nylon mooring rope and cables attached to winches. Since then, cables have been added that circle a bitt on the barge and on the boat, and the cables are tightened with a ratchet. To remove these cables and ready the ship for cruising, the captain testified that it would be a fairly normal operation similar to that conducted by barges that are rigged for towing. Further, the ship still conducts "man overboard" and fire drills at periodic intervals, as well as periodic firing of the engines. Finally, the captain understands that the management of the casino has no intention of conducting any gambling cruises in the foreseeable future.

The United States Coast Guard issued a Certificate of Inspection to the TREASURE CHEST in July, 2001 requiring it to remain in "continuously-moored operation on Lake Pontchartrain." Nevertheless, the certificate requires that the pilothouse be manned at all times passengers are aboard the casino. The TREASURE CHEST is licensed by the Coast Guard as a passenger vessel and required to have a master, able and ordinary seamen, a chief engineer, and an oiler at all times. She may also have up to 179 other persons in the crew on board the vessel in addition to passengers. Except for the designation that the boat be continuously moored, the Certificate of Inspection is identical to the one issued by the Coast Guard before the

legislature amended the riverboat gambling statute.

The TREASURE CHEST's owners argue that vessel status was lost at the moment the statute became effective. Plaintiff maintains that the TREASURE CHEST is still a vessel in navigation because it remains ready to sail at a moment's notice. Plaintiff argues that the amended statute regulates only the activity which can take place on the contrivance, not its capabilities as a vessel. Finally, plaintiff points to two maintenance cruises the TREASURE CHEST conducted on June 4 and 5, 2002 for the purpose of conducting dredging operations beneath the casino as evidence of the casino's navigable capacities. During these times plaintiff was responsible for the operation and navigation. Defendant, however, points out that at the time of these cruises, no gambling occurred, and the passengers were not permitted aboard the structure. Moreover, at the time of his injury the plaintiff was removing carpet not piloting the vessel.

Having discussed the facts of the case and the arguments of the parties, the Court now turns to the merits of the motions.

## II.  LAW & ANALYSIS

### A.  Summary Judgment Standard

A district court can grant a motion for summary judgment only when the " 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). When considering a motion for summary judgment, the district court "will review the facts drawing all inferences most favorable to the party op-posing the motion." *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir.1986). The court must find "[a] factual dispute ... [to be] 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party ... [and a] fact ... [to be] 'material' if it might affect the outcome of the suit under the governing substantive law." *Beck v. Somerset Techs., Inc.*, 882 F.2d 993, 996 (5th Cir.1989) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

"If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial." *Engstrom v. First Nat'l Bank of Eagle Lake*, 47 F.3d 1459, 1462 (5th Cir.1995) (citing *Celotex*, 477 U.S. at 322—24, 106 S.Ct. 2548, and Fed.R.Civ.P. 56(e)). The mere argued existence of a factual dispute will not defeat an otherwise properly supported motion. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "If the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. *Id.* at 249—50, 106 S.Ct. 2505 (citations omitted).

### B.  The Jones Act and Vessel Status

Recovery under the Jones Act is limited to seamen injured aboard a vessel in navigation. *See Pavone v. Mississippi Riverboat Amusement Corp.*, 52 F.3d 560, 565 (5th Cir.1995). The Fifth Circuit has issued numerous opinions defining the term "vessel in navigation," including one on the issue of floating casinos; i.e., *Pavone*. Although vessel status is often a fact-intensive question making summary judgment difficult, the parties do not dispute the essential facts of the present case. Rather, what remains is the application of legal principles to those facts.

Defendants rely mainly on the Fifth Circuit's decision in *Pavone* and argue that the TREASURE CHEST has been withdrawn from navigation or is a work platform. *Pavone* concerned the claims of two plaintiffs who were injured on the BILOXI BELLE casino in Biloxi, Mississippi and subsequently pursued claims under the Jones Act. The district court granted summary judgment in favor of the defendants concluding the BILOXI BELLE was not a vessel in navigation; the Fifth Circuit affirmed. *Id.* at 562. In order to properly determine the applicability of *Pavone* to the case at hand, the Court must consider the physical features of the BILOXI BELLE as set forth in the Fifth Circuit's decision.

The BILOXI BELLE was originally constructed in Morgan City, Louisiana and towed to Corpus Christi, Texas where it served as a floating restaurant and bar. Several years later, the restaurant was re-outfitted as a casino, towed to Biloxi, and renamed the BILOXI BELLE casino. In Biloxi, the structure was secured to the shore by lines tied to sunken steel pylons. Further, shore-side utility lines were connected permanently to the structure. As for features similar to traditional vessels, the BILOXI BELLE had a steel hull, raked bow, bilge pumps, and ballast tanks.

As for non-vessel features, the BILOXI BELLE has no engine, captain, navigational aids, crew quarters or lifesaving equipment; the pilot house is purely aesthetic and contains no operative steering mechanism. The evidence indicated that the casino was moved only once from its location due to an impending hurricane.

The *Pavone* court began its analysis by assuming that the BILOXI BELLE was built for non-vessel purposes and was permanently, or indefinitely, moored to the bank, thus making it "withdrawn for navigation" or a "work platform." *Id.* at 568. The court considered these concepts as "intertwined" and opined that both concepts may be defined by reference to three factors which were applicable in the case of such structures: (1) whether the structure was originally constructed as a work platform; (2) whether the structure is moored or secured at the time of the accident; and (3) whether the platform is capable of movement and whether any transportation is incidental to its primary mission.[1] *Id.* at 569–70 (citing *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290, 293–94 (5th Cir.1990) (internal quotations omitted)).

Applying these precepts, the Fifth Circuit found that the BILOXI BELLE was never constructed for navigational purposes.[2] *Id.* at 570. Further, it was indefi-

---

[1] The *Pavone* court relied on a trilogy of previous Fifth Circuit cases to reach its holding: *Bernard v. Binnings Construction Co.*, 741 F.2d 824 (5th Cir.1984), *Ducrepont v. Baton Rouge Marine Enters., Inc.*, 877 F.2d 393 (5th Cir.1989), and *Gremillion v. Gulf Coast Catering Co.*, 904 F.2d 290 (5th Cir.1990). *Bernard* found that a work punt was not a vessel because it "was not designed for navigation, was not engaged in the business of navigation, and was not actually in navigation at the time of [plaintiff's] injuries." *Bernard*, 741 F.2d at 832. *Ducrepont* held that a barge used as a work platform, although originally constructed for use as a vessel, was not a vessel at the time of the accident because it was moored at the time of the accident, and

any transportation function it performed was incidental to its primary purpose of acting as a work platform. *Ducrepont*, 877 F.2d at 395. Finally, *Gremillion* determined that a barge used to house offshore workers that was spudded down to the bay floor on one side and moored to the shore on the other side was not a vessel because it was not designed for navigation and its primary purpose was to provide a living facility. *Gremillion*, 904 F.2d at 294.

[2] The court was careful to point out, however, that this was not a determinative factor following the logic of *Ducrepont*. *Pavone*, 52 F.3d at 570.

nitely moored and had been at its present location since it became a casino except for one incident where it was moved due to an impending hurricane, an event the court found incidental to the casino's function. *Id.* The court concluded that the BILOXI BELLE was a work platform and was removed from navigation; thus, it was not a vessel in navigation. *Id.* Accordingly, the court affirmed the summary judgment in favor of the defendant.

Defendant in the present case also relies on a previous decision by this Court in *Martin v. Boyd Gaming Corp.*, 252 F.Supp.2d 321 (E.D.La.2003), in which the Court held that the TREASURE CHEST was not a vessel as a matter of law. *See id.* at 324. The *Martin* court relied on *Pavone* and *Ducrepont v. Baton Rouge Marine Enters.* and found that the TREASURE CHEST had ceased transportation on April 1, 2001 at the time the statute became effective. The *Martin* court further concluded that the two maintenance cruises were incidental to the vessel's "primary function as a floating, but stationary, gambling casino." *Id.* Further, the court found that the defendant's history of compliance with the state act and the Coast Guard certificate of inspection requiring a "continuously moored" operation indicated an intent to remain out of navigation. *Id.*

■ Plaintiff insists that this Court consider the TREASURE CHEST's capacity to navigate on a moment's notice and the fact that it has navigated twice since April 1, 2001. Plaintiffs further point out that the Louisiana legislature requires that riverboat gambling can only be conducted on a "vessel" which is certified by the United States Coast Guard for the carriage of passengers and crew. *See* LA. REV.

STAT. ANN. 27:44(23) (West Supp.2002). The plaintiff finally notes that an attempt to amend this statute to allow gambling on barges was rejected in the Louisiana legislature.[3]

The Court finds that such a showing in insufficient to confer vessel status. The mere fact that a vessel has the capacity to resume navigation or is required to maintain Coast Guard inspection certificates does not change the fact that the TREASURE CHEST is legally prohibited from navigating the waters of Lake Pontchartrain while engaged in the very business for which it was constructed. The only movements the TREASURE CHEST has undertaken were two maintenance cruises to allow for dredging. No gambling was conducted and no passengers were aboard on either cruise. Such activities are clearly unrelated to the structure's intended use as a casino.

Instead, the Court finds the rationale of *Pavone* and *Martin* persuasive. It is true that the TREASURE CHEST in this case and the BILOXI BELLE in *Pavone* are distinguishable in the sense that the BILOXI BELLE was never constructed for vessel purposes, while the TREASURE CHEST was once utilized as a vessel in navigation. This, however, is a distinction without a difference. In *Ducrepont*, the Fifth Circuit clearly stated that the fact that a vessel was once in navigation does not preclude it from later losing vessel status and becoming a work platform; in fact, this was the very issue before the *Ducrepont* court. *See Ducrepont v. Baton Rouge Marine Enters.*, 877 F.2d 393, 395 (5th Cir.1989).

**3.** Plaintiff also refers this Court to its previous holding in *Dalleo v. Treasure Chest Casino, L.L.C.*, in which the issue of vessel status of the casino was argued. The Court, at that time, denied the defendant's motion for sum-mary judgment, but the case settled before the Court assigned reasons. Some of the issues presented in *Dalleo* were different from the present case, and the Court is not persuaded by the plaintiff's reliance on that case.

The TREASURE CHEST's owners have clearly manifested their intent to maintain operations on Lake Pontchartrain as a floating casino. As such, she is required by law to remain dockside and is not permitted to navigate while engaged in that business. The Court finds no evidence that the legislative requirements that the casino be inspected by the Coast Guard as a sign of intent to keep the employees under the coverage of the Jones Act. Further, the two maintenance cruises are not connected to the function of the vessel, which is to operate as a gambling casino.

Finally, the Court is not persuaded by the plaintiff's analogy of the TREASURE CHEST to the "special purpose structures" discussed by the Fifth Circuit in *Manuel v. P.A.W. Drilling & Well Service, Inc.*, 135 F.3d 344 (5th Cir.1998), in which the court found a spud barge with a movable workover rig temporarily attached to be a vessel in navigation. In *Manuel*, the court gave the following definition of such structures: "Despite the outward appearance of the structure at issue, if a primary purpose of the craft is to transport passengers, cargo, or equipment from place to place across navigable waters, then that structure is a vessel." *Id.* at 348. Of great importance to the *Manuel* court was the fact that, although the structure was stationary at the time of the seaman's injury, it had been used to transport the seaman and equipment into place prior to that time. *See id.* at 349. For this reason, *Manuel* is distinguishable from the instant case. In order to perform its designed function as a casino, the TREASURE CHEST is required by law to remain dockside. It moves neither cargo nor crew across navigable waters to accomplish its mission. Plaintiff's attempted comparison to the structures at issue in *Manuel* is a repetition of its capacity argument, which was rejected above.

## III. PLAINTIFF'S CAUSE OF ACTION UNDER GENERAL MARITIME LAW

Plaintiff next asserts that if he is not a seaman, then he still has a general maritime law cause of action because the TREASURE CHEST was floating in navigable waters at the time of his injury and thus within the admiralty jurisdiction.

Of course, the significance of determining admiralty jurisdiction in tort is not only to establish the availability of a federal forum, but also to determine the applicable substantive law. A holding that a particular occurrence is within the admiralty jurisdiction generally amounts to a holding that the law governing that occurrence is the substantive maritime law. The policy justification for applying substantive maritime law within the admiralty jurisdiction is the necessity of uniformity. Under this doctrine it is the belief that "in planning their conduct and business expenses, persons engaged in maritime commerce should be able to rely on the applicability of a single law." *See* Hart, *The Supreme Court*, 1958 Term. 73 HARV. L.REV. 84, 146 (1959). *See also, Southern Pacific Co. v. Jensen*, 244 U.S. 205, 218, 37 S.Ct. 524, 61 L.Ed. 1086 (1917) (holding that state laws could not preempt application of the general maritime law). If state laws come in conflict with the general maritime law, the latter generally prevails. Even state workman's compensation statutes that interfere with general maritime law principles must bend to the dictates of general maritime law. *See Green v. Vermilion Corp.*, 144 F.3d 332, 341 (5th Cir. 1998); *Thibodaux v. Atlantic Richfield Co.*, 580 F.2d 841, 844 (5th Cir.1978). If the present case is within the Court's admiralty jurisdiction and the applicable substantive law is general maritime law, the plaintiff may have a tort claim against the TREASURE CHEST or its owner. *See*

*Green, supra; Thibodaux, supra.* If the matter is not within the admiralty jurisdiction, the plaintiff will be restricted to a compensation claim. As an initial matter, therefore, this Court must determine whether admiralty jurisdiction applies to the present claim.

### A. Admiralty Jurisdiction

The source of admiralty and maritime jurisdiction in the United States is Article III of the United States Constitution. That Article in part provides: "The judicial power shall extend to all cases of admiralty and maritime jurisdiction." Nothing more is said. The terms are not defined. Therefore, to understand the nature and scope of admiralty jurisdiction it is helpful to examine the historical derivation of Article III and then review its subsequent development through judicial interpretation.

Late in July of 1787, 24 resolutions adopted by the Constitutional Convention were submitted to a committee termed the Committee of Detail. The Committee's assignment was to prepare a draft of the Constitution. The precise verbiage "to all cases of admiralty and maritime jurisdiction" was not among the 24 resolutions. It was supplied by the Committee of Detail. There is some dispute as to the source of the terminology selected by the Committee. One legal scholar has implied that the terminology, as well as the concept of a federal admiralty jurisdiction, was little more than an afterthought of John Rutledge of South Carolina, the Chairman of the Committee of Detail. *See Putnam, How the Federal Courts Were Given Admiralty Jurisdiction,* 10 CORN. LQ 460 (1925). Others argue that such wording was included in earlier drafts of the Constitution. *See* ROBINSON, ADMIRALTY AND FEDERALISM, Chapter 1, 1970. Whatever the source of its birth might have been, the nurture and development of this phase is clearly a product of judicial interpretation.

Admiralty jurisdiction in England was restricted to certain defined and enumerated areas such as civil salvage, prize salvage, contracts made upon the high seas, suits for freights and wages, and torts occurring upon the high seas. *See* WISWALL F.L., THE DEVELOPMENT OF ADMIRALTY JURISDICTION AND PRACTICE SINCE 1800, 8–11 (1970). The early cases in this country involving admiralty jurisdiction adopted the restricted English view. *See, e.g., Waring v. Clarke,* 46 U.S. (5 How.) 441, 452, 12 L.Ed. 226 (1847). Nevertheless, in *De Lovio v. Boit,* 7 F. Cas. 418 (C.C.D.Mass.1815), the restricted English view was forever rejected. Instead, the Court concluded "that the national policy, as well as the juridical logic, requires the clause of the Constitution to be construed so as to embrace all maritime contracts, torts and injuries ..." *Id.* at 418. Admiralty jurisdiction since *De Lovio v. Boit* has been extended to "all maritime contracts and torts" rather than certain select ones as was the case in England. But, the question remained: when was a contract or tort "maritime." This was grist for subsequent courts to mill.

With regard to contracts, the courts fashioned the rule based on subject matter. If the subject matter of the contract involved maritime activities or commerce, the contract was generally considered a "maritime contract." For example, contracts concerning the loading or the offloading of cargo to and from ships or the lease of containers for use in ocean transportation or a contract to repair a ship are considered maritime wherever they are negotiated and signed. *See Pillsbury Flour Mills Co. v. Interlake S.S. Co.,* 40 F.2d 439, 440–41 (2d Cir.1930); *CTI–Container Leasing Corp. v. Oceanic Operations Corp.,* 682 F.2d 377 (2d Cir.1982); *New Bedford Dry Dock Co. v. Purdy,* 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922).

With regard to torts, however, a different rule evolved. The early cases moved toward the acceptance of a "locality" test. Under this test a tort which occurred in a certain locality was considered a maritime tort; nothing more was required. The "locality" originally extended only to the sea and to the tidewaters, that is to say, the waters affected by the ebb and flow of the tide. *See The Steam–Boat Thomas Jefferson*, 23 U.S. (10 Wheat.) 428, 6 L.Ed. 358 (1825); *The Steamboat Orleans v. Phoebus*, 36 U.S. (11 Pet.) 175, 9 L.Ed. 677 (1837).

In *Genesee Chief*, 53 U.S. (12 How.) 443, 13 L.Ed. 1058 (1851), this tidewater restriction was rejected in favor of a broader locality. The *Genesee Chief* arose as a result of a collision between the schooner CUBA and the steam vessel GENESEE CHIEF on Lake Ontario. The court held that the incident was within the admiralty jurisdiction. Subsequent courts interpreted this case to establish the principle that admiralty jurisdiction was not limited to the tidewaters but extended to all "navigable bodies of water." *See, e.g., Fretz v. J.C. Bull & Co.*, 53 U.S. (12 How.) 466, 468, 13 L.Ed. 1068 (1851); *The Eagle*, 75 U.S. (8 Wall.) 15, 19 L.Ed. 365 (1868). Once this principle was established, future courts began the task of defining navigability without geographical restrictions. The general rule was summarized by the *Daniel Ball*, 77 U.S. (10 Wall.) 557, 563, 19 L.Ed. 999 (1870):

> Navigable waters are those that form in their ordinary condition by themselves, or by uniting with other waters, a continued highway over which commerce is or may be carried on with other states or foreign countries in the customary modes in which such commerce is conducted by water.

The courts have tended to liberally construe the requirements of navigability. *See, e.g., Guynn, An Analysis of Navigable Waters of the United States*, 18 BAYLOR L.REV. 551 (1966); *Gilmore & Black, The Law of Admiralty*, 28 (Foundation Press 1975) (1957). Navigable waters came to include any body of water which has some, however remote, unfettered access to a sea, lake or even river. *See Sanders v. Placid Oil Co.*, 861 F.2d 1374 (5th Cir. 1988); *The Daniel Ball*, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1870); *Ex. Parte Boyer*, 109 U.S. 629, 3 S.Ct. 434, 27 L.Ed. 1056 (1884). Under the locality test, therefore, a tort which occurred on navigable waters was a maritime tort and, therefore, within the admiralty jurisdiction whether or not it involved maritime activity or commerce. *See, e.g., Benazet v. Atlantic Coast Line R.R. Co.*, 442 F.2d 694 (2d Cir.1971); *Weinstein v. Eastern Airlines*, 316 F.2d 758 (3d Cir.1963); *Wilson v. Transocean Airlines*, 121 F.Supp. 85 (N.D.Cal.1954).

Notwithstanding the degree of certainty and predictability which the locality test afforded, doubts began to be expressed as to the advisability of a jurisdictional rule for maritime torts based *entirely* upon the situs of the injury or damages. An early expression of concern over the strict locality rule was voiced by Benedict in his Treatise on Admiralty. After setting forth a summary of the locality rule, Benedict went on to say "it has nevertheless been *doubted* whether the civil admiralty jurisdiction, in cases of tort, does not depend upon the relation of the parties to some ship or vessel and embrace only those tortuous violations of maritime right and duty which occur in relation to vessels to which the admiralty jurisdiction and cases of contract apply." 1 BENEDICT, ADMIRALTY § 127 at 350 (6th Ed.1950) (emphasis supplied). This comment became known as "Mr. Benedict's celebrated doubt." *McGuire v. City of New York*, 192 F.Supp. 866, 870 (S.D.N.Y.1961). The first judicial expression of "Mr. Benedict's celebrated doubt" appeared in *Campbell v. H. Hack-*

*field & Co.,* 125 F. 696 (9th Cir.1903). In *Campbell* an employee sued his employer for injuries sustained while unloading cargo. The Court of Appeals for the Ninth Circuit concluded that the employee's cause of action was not within the admiralty jurisdiction:

> The fundamental principle underlying all cases of tort, as well as contract, is that, to bring a case within the jurisdiction of the court of admiralty, maritime relations of some sort must exist for the all sufficient reason that the admiralty does not concern itself with non maritime affairs.

*Id.* at 697.

Congress as well as the courts began pushing the limits of the locality rule. For example, the Extension of Admiralty Jurisdiction Act, 46 U.S.C.App. § 740, extended admiralty jurisdiction to damage on land caused by a vessel on navigable waters. Maintenance and cure, a general maritime law remedy, was expanded to include injuries which occurred on land as long as the crew member was under ship articles or in the ship's employ. *O'Donnell v. Great Lakes Dredge & Dock Co.,* 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943). The warranty of seaworthiness, a general maritime law remedy, was extended to injuries which occurred over land. *Gutierrez v. Waterman SS Corp.,* 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963). The admiralty jurisdiction over a cause of action based on the Jones Act was held to depend not on the place where the injury occurs but on the nature of the seaman's service. *Swanson v. Marra Bros. Inc.,* 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946).

By 1972, the locality rule had been weakened by judicial and legislative exceptions. In a less complicated time, perhaps the rule was effective and even just. In a simpler society the only activity conducted on or over navigable water was maritime in nature but with the advent of movable offshore drilling rigs, airplanes, river boat casinos, water skis, and other modern modes of transportation or recreation the situation changed.

It was appropriate for the Supreme Court to focus on the applicability of the locality rule in our modern society. *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), afforded the Court this opportunity. In *Executive Jet* an airplane struck a flock of sea gulls as it was taking off from a lakefront airport in Cleveland, Ohio. As a result, the plane lost its power and hit a portion of the airport fence and then settled in Lake Erie just off the end of the runway. The plane was departing Cleveland on a charter flight to Portland, Maine. There were no personal injuries but the aircraft soon sank and became a total loss. In invoking federal admiralty jurisdiction, the owner of the aircraft filed suit for property damage alleging that the crash was caused by the city's negligent failure to keep the runway free from the birds or to give warning of their presence. Since the plane landed in navigable waters, the site of the damage, the plaintiff alleged the applicability of the general maritime law. The lower court dismissed the case on the ground that it was not within the admiralty jurisdiction.

The Supreme Court met the jurisdictional issue head on:

> [T]here has existed over the years a judicial, legislative and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test. One area in which locality as the

exclusive test of admiralty tort jurisdiction has given rise to serious problems in application is that of aviation. For the reason discussed above and those to be discussed we have concluded that maritime locality alone is not a sufficient predicate for admiralty jurisdiction in aviation cases.

*Id.* at 261, 93 S.Ct. 493. Concluding, the Court observed: "It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity." *Id.* at 269, 93 S.Ct. 493.

The Court in *Executive Jet* jettisoned the locality rule and in its place substituted what has been termed the "locality plus" rule. Under this rule, for admiralty jurisdiction to apply the wrong must occur on navigable waters plus it must bear a significant relationship to traditional maritime activity. Although the *Executive Jet* ruling discussed aviation, the new rule was quickly applied to all cases of maritime jurisdiction *See, Kelly v. Smith,* 485 F.2d 520 (5th Cir.1973); *Peytavin v. Government Employees Ins. Co.,* 453 F.2d 1121(5th Cir.1972). After *Executive Jet,* both a maritime locus and a maritime nexus was required. Locus was easy to determine; nexus proved a bit harder. The task of future courts in applying this rule was in determining what constituted a significant relationship to traditional maritime activity.

A trilogy of later Supreme Court cases defined the scope of the *Executive Jet* Court's new test for admiralty jurisdiction. The first case, *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), concerned claims arising out of the collision between two pleasure boats on navigable waters that resulted in the death of one of the boat's occupants. The district court found that neither of the pleasure boats involved in the collision had ever been used in a com-

mercial context, and that, since the vast majority of traditional maritime activities was commercial in nature, this precluded admiralty jurisdiction. *Richardson v. Foremost Ins. Co.,* 470 F.Supp. 699 (M.D.La.1979). The Court of Appeals for the Fifth Circuit reversed, recognizing that two boats traversing navigable waters are engaged in a "traditional maritime activity" when a collision occurs between them since, regardless of their size or purpose, boats are governed by the same "Rules of the Road." *See Richardson v. Foremost Ins. Co.,* 641 F.2d 314 (5th Cir.1981). In upholding the Court of Appeals' findings, the Supreme Court expressly refuted the assertion that a commercial flavor is required for a maritime activity to satisfy the *Executive Jet* nexus requirement. *Foremost Ins. Co.,* 457 U.S. at 674, 102 S.Ct. 2654. The Court instead held that jurisdiction existed because of the potential disruptive impact such a collision may have on maritime commerce coupled with the traditional concern of admiralty courts over navigation. *See Id.* at 675–77, 102 S.Ct. 2654. The Court further noted that the inquiry focused on the relationship of the alleged wrong to maritime commerce. *Id.* at 675, 102 S.Ct. 2654.

The Court again addressed the issue of admiralty jurisdiction in *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990). This case concerned tort claims filed after a fire, which was caused by a defective washer/ dryer aboard a yacht docked at a marina, and burned the yacht, as well as nearby boats and the marina itself. The Court began its analysis looking to the two-prong test of *Foremost:* the potential disruptive impact on maritime commerce and an activity bearing a substantial relationship to maritime commerce. *Id.* at 362, 110 S.Ct. 2892. Considering the impact on maritime commerce, the Court concluded that the prop-

er analysis must focus on the "general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity." *Id.* at 363, 110 S.Ct. 2892. Considering the facts before it, the Court held that a fire aboard a vessel docked at a marina was a potential disruption to maritime commerce.

Turning to the substantial relationship prong of the test, the Court in *Sisson* defined the relevant activity "not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Id.* at 364, 110 S.Ct. 2892. Thus, the Court determined that the relevant activity in that case was the storage and maintenance of a vessel on navigable waters. *Id.* at 365, 110 S.Ct. 2892. The Court then looked to the definition of "traditional maritime activity" and concluded that its definition extended "at least to any other activities traditionally undertaken by vessels, commercial or noncommercial." *Id.* at 367, 110 S.Ct. 2892. Docking a vessel at a marina on navigable waters was held to be an essential maritime activity, which brought the case within the Court's admiralty jurisdiction. *Id.*

The final case in this trilogy is *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), which held that admiralty jurisdiction extends to claims for damages caused by a vessel's pile driving activities in the Chicago River, which weakened underground tunnels causing water to flood into the basements of several Chicago buildings. The Court held that the first prong of the inquiry turned "on a description of the incident at an intermediate level of possible generality," which the Court described as damage by a vessel in navigation to an underwater structure. *Id.* at 539, 115 S.Ct. 1043. Turning the second inquiry, the Court defined as asking "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand." *Id.* at 539–40, 115 S.Ct. 1043. The Court concluded that this test was met because the case before it concerned maintenance work being done on a navigable waterway performed by a vessel in navigation.

■ The cases cited above have established a two part test for determining a maritime nexus sufficient to establish maritime jurisdiction. First, a court must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Second the court must examine the general conduct from which the incident arose to determine whether there is a substantial relationship between the activity giving rise to the incident and traditional maritime activity. One admiralty scholar has noted that the two part test is designed to operate as a policy-based filter that allows the courts flexibility in screening out unusual fact situations that are not maritime in nature, but happen to occur in navigable waters. THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 3–5 at 96 (3d ed.2001).

■ In the present case the undisputed facts are that the plaintiff at the time of his injury was removing carpet. True, his title was captain of the TREASURE CHEST, but in truth he was a captain in name only. His vessel has been beached. He has no "captain duties" while the TREASURE CHEST is being used as a gambling site, the purpose for which it was built and operated. What he was doing at the time of his injury-removing carpet-had no potentially disruptive impact on maritime commerce and has no substantial relationship to traditional maritime activity. Thus, this plaintiff, while satisfying the locus aspect of the test, fails to meet the

nexus aspect, and, consequently, the matter is not within the admiralty jurisdiction of the court.

## III. CONCLUSION

For the reasons set forth above, the Court finds, as a matter of law, that the TREASURE CHEST is not a vessel in navigation, and the plaintiff's claim is not within the admiralty jurisdiction. Accordingly, IT IS ORDERED that the plaintiff's motion for partial summary judgment is DENIED, and the defendant's motion for summary judgment is GRANTED. IT IS FURTHER ORDERED that the plaintiff's claims be DISMISSED WITH PREJUDICE.