**Oliver ARCH**

v.

**TREASURE CHEST CASINO, L.L.C.**

No. Civ.A. 03–950.

United States District Court, E.D. Louisiana.

Feb. 17, 2004.

---

Timothy John Falcon, Jeremiah A. Sprague, Falcon Law Firm, Marrero, LA, for Plaintiff.

Robert Hugh Murphy, Peter Brooks Sloss, Peter B. Tompkins, James Melvin Jacobs, John Herr Musser, V, Murphy, Rogers & Sloss, New Orleans, LA, for Defendant.

## ORDER AND REASONS

DUVAL, District Judge.

Before the Court is a Motion for Summary Judgment (Rec.Doc. 22) filed by defendant Treasure Chest Casino, L.L.C. ("Treasure Chest"). Having reviewed the pleadings, memoranda and relevant law, and having heard oral argument, the Court **GRANTS** defendant's motion as meritorious.

## I. BACKGROUND

Plaintiff Oliver Arch was employed as a deckhand upon the M/V TREASURE CHEST riverboat casino owned and operated by defendant Treasure Chest beginning in April 1996. On April 10, 2002, plaintiff was seriously injured on the job while climbing up a maintenance ladder after chipping rust from and painting on the vessel's hull. Plaintiff alleges defendant's negligence and the vessel's unseaworthiness caused the accident.

The M/V TREASURE CHEST is a paddlewheel-driven riverboat casino styled after a 19th century era Louisiana passenger steamboat. It is a 213.5 foot-long fully operational self-propelled vessel. It began operations in Lake Pontchartrain in September of 1994. From that time until March 31, 2001, the M/V TREASURE CHEST was required to and did make daily gaming cruises for ninety minutes out of every three hours, weather permitting. However, in 2001 the Louisiana Legislature abolished the gaming cruise requirement, amending the law to provide that "gaming may only be conducted on a riverboat while it is docked and the licensee shall not conduct cruises or excursion." La.Rev.Stat. Ann. § 27:65(B)(1)(c). *See also,* La.Rev.Stat. Ann. § 27:66, & 91 (West Supp.2002). Consequently, since April 1, 2001, the M/V TREASURE CHEST has been moored to a floating dock.

On July 31, 2001, the United States Coast Guard issued a Certificate of Inspection effective through July of 2007 requiring the M/V TREASURE CHEST to remain in "continuously moored operation on Lake Pontchartrain." Nevertheless, the M/V TREASURE CHEST is required to man its pilothouse at all times passengers are aboard and to staff the vessel with a full "navigational crew," including a captain, mate, chief engineer, and oiler, and deckhands. Except for its continuous mooring requirement, the current Coast Guard Certificate is identical to the one issued before the riverboat casino legislation change effective April 1, 2001.

Since the April 1, 2001, amendment to riverboat casino legislation, the M/V TREASURE CHEST has sailed only twice, on 4th and 5th day of June, 2002. Both cruises, which occurred two months after plaintiff's accident, were brief maintenance trips in which the vessel moved roughly 200 feet from her permanently moored location to allow for maintenance dredging. No passengers were aboard during these cruises and no freight was transported.

Defendant Treasure Chest employed plaintiff Oliver Arch upon the M/V TREASURE CHEST from April 1996 until April 2002 as a deckhand. At all times material, plaintiff carried a seaman's ticket, or "Z Card." Prior to the permanent mooring of the M/V TREASURE CHEST in April of 2001, plaintiff's duties as a deckhand included the following: washing and scrubbing the vessel's deck; chipping and painting the vessel's interior and exterior; cleaning vessel windows; mopping rain off vessel deck; performing man overboard drills including manning rescue boat; participating in fire drills; monitoring tides; inspecting mooring lines; casting off mooring lines for sail; and standing watch on bow or stern during sail. Plaintiff states that the only listed duties discontinued upon the vessel's permanent mooring were (1) casting off lines for sailing and (2) standing watch during cruises. Plaintiff's job description included all other listed duties at the time of the accident.

On April 3, 2003, plaintiff Arch filed suit in this Court, alleging admiralty jurisdiction under Article III, Section 2 of the United States Constitution and 28 U.S.C. § 1331. Treasure Chest filed the instant motion for summary judgment on November 18, 2003. The Court heard oral argument on December 10, 2003, and took the motion under submission that day.

## II. APPLICABLE LEGAL STANDARDS

### A. Summary Judgment Standard

Summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*

*v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the non-movant "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. 2548. "[M]ere allegations or denials" will not defeat a well-supported motion for summary judgment. Fed.R.Civ.P. 56(e). Rather, the non-movant must come forward with "specific facts" that establish an issue for trial. *Id.*

When deciding a motion for summary judgment, the Court must avoid a "trial on affidavits. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts" are tasks for the trier-of-fact. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505. To that end, the Court must resolve disputes over material facts in the non-movant's favor. "The party opposing a motion for summary judgment, with evidence competent under Rule 56, is to be believed." *Leonard v. Dixie Well Service & Supply, Inc.,* 828 F.2d 291, 294 (5th Cir.1987).

*B. Admiralty Jurisdiction*

When state laws come into conflict with the general maritime law, the latter prevails, even in the case that federal maritime standards supercede state workman's compensation statutes. *See Green v. Vermilion Corp.,* 144 F.3d 332, 341 (5th Cir.1998). If the instant matter falls under admiralty jurisdiction, then plaintiff may have a tort claim against Treasure Chest. If, on the other hand, this matter lacks admiralty jurisdiction, plaintiff is limited to a state law worker's compensation claim.

Supreme Court jurisprudence has established a two part test for determining a maritime nexus sufficient to establish admiralty jurisdiction: .

(1) First, a court must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce;

(2) Second, the court must examine the general conduct from which the incident arose to determine whether there is a substantial relationship between the activity giving rise to the incident and traditional maritime activity.

*Hertz v. Treasure Chest Casino,* 274 F.Supp.2d 795, 805; *citing Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995). This test is designed to operate as a policy-based filter that allows courts flexibility in screening out unusual fact situations that are not maritime in nature, but happen to occur in navigable waters. Thomas J. Schoenbaum, *Admiralty and Maritime Law,* § 3–5 at 96 (3d ed.2001).

Traditionally, a tort was considered within the admiralty jurisdiction if it occurred on navigable waters. Frank L. Maraist & Thomas C.Galligan, Jr., *Personal Injury in Admiralty,* § 4–1 at 29 (2000). This erstwhile standard is known as the "locality test." The Supreme Court began its modern focus on the applicability of admiralty's ancient locality rule in *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972). There, an airplane struck a flock of sea gulls while taking off from a lakefront airport. The aircraft lost control and then settled in Lake Erie just off the end of the runway. No personal injuries resulted, but the aircraft soon sank and became a total loss. In invoking federal admiralty jurisdiction, the owner of the aircraft filed suit for property damage alleging that the crash was caused by the city's negligent failure to keep the runway free from the birds or to give warning of

their presence. Since the plane landed in navigable waters, the site of the damage, the plaintiff alleged the applicability of the general maritime law. Addressing admiralty jurisdiction, the Supreme Court amended the locality test as follows:

> [T]here has existed over the years a judicial, legislative and scholarly recognition that, in determining whether there is admiralty jurisdiction over a particular tort or class of torts, reliance on the relationship of the wrong to traditional maritime activity is often more sensible and more consonant with the purposes of maritime law than is a purely mechanical application of the locality test. One area in which locality as the exclusive test of admiralty tort jurisdiction has given rise to serious problems in application is that of aviation. For the reason discussed above and those to be discussed we have concluded that maritime locality alone is not a sufficient predicate for admiralty jurisdiction in aviation cases.

*Id.* at 261, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454. In conclusion, the Court remarked: "It is far more consistent with the history and purpose of admiralty to require also that the wrong bear a significant relationship to traditional maritime activity." *Id.* at 269, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454.

In place of the traditional locality rule, *Executive Jet* court created what has been termed the "locality plus" standard. Under this rule, for admiralty jurisdiction to apply the wrong must occur on navigable waters plus it must bear a significant relationship to traditional maritime activity. Although the *Executive Jet* ruling discussed aviation, the new rule was quickly applied to all cases of maritime jurisdiction. *See Kelly v. Smith,* 485 F.2d 520 (5th Cir.1973); *Peytavin v. Government Employees Ins. Co.,* 453 F.2d 1121 (5th Cir.1972). *Executive Jet's* locality plus rule required both a maritime locus and a

maritime nexus. Locus, the traditional requirement, was understandably easier to determine than nexus. The crux of this new rule was the significant relationship to traditional maritime activity determination.

Three subsequent Supreme Court opinions defined the scope of the *Executive Jet* Court's ground-breaking test for admiralty jurisdiction. The first case, *Foremost Ins. Co. v. Richardson,* 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982), arose out of the collision between two pleasure boats on navigable waters. The district court found that neither of the pleasure boats involved in the collision had ever been used in a commercial context, and that, since the vast majority of traditional maritime activities was commercial in nature, this precluded admiralty jurisdiction. *Richardson v. Foremost Ins. Co.,* 470 F.Supp. 699 (M.D.La.1979). However, the Fifth Circuit reversed, noting that two boats traversing navigable waters are engaged in a "traditional maritime activity" when a collision occurs between them since, regardless of their size or purpose, boats are governed by the same "Rules of the Road." *See Richardson v. Foremost Ins. Co.,* 641 F.2d 314 (5th Cir.1981). Affirming the Court of Appeals, the Supreme Court expressly refuted the assertion that a commercial flavor is required for a maritime activity to satisfy the *Executive Jet* locality plus test. *Foremost Ins. Co.,* 457 U.S. at 674, 102 S.Ct. 2654. Instead, the Court held that jurisdiction existed because of the potential disruptive impact such a collision may have on maritime commerce coupled with the traditional concern of admiralty courts over navigation. *See id.* at 675–77, 102 S.Ct. 2654. The Court further noted that the inquiry focused on the relationship of the alleged wrong to maritime commerce. *Id.* at 675, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300.

The Supreme Court again addressed admiralty jurisdiction in *Sisson v. Ruby,* 497 U.S. 358, 110 S.Ct. 2892, 111 L.Ed.2d 292 (1990), which addressed tort claims arising out of a fire caused by a defective washer/dryer aboard a yacht docked at a marina that burned the yacht, nearby boats, and the marina itself. The Court began by restating the two-pronged test of *Foremost:* (1) the potential disruptive impact on maritime commerce and (2) an activity bearing a substantial relationship to maritime commerce. *Id.* at 362, 110 S.Ct. 2892. The *Sisson* Court concluded that the proper analysis must focus on the "general features of the type of incident involved to determine whether such an incident is likely to disrupt commercial activity," holding that a fire aboard a vessel docked at a marina was a potential disruption to maritime commerce. *Id.* at 363, 110 S.Ct. 2892. As to the substantial relationship prong of the *Foremost* test, the Court in *Sisson* defined the relevant activity "not by the particular circumstances of the incident, but by the general conduct from which the incident arose." *Id.* at 364, 110 S.Ct. 2892. Thus, the Court determined that the relevant activity in that case was the storage and maintenance of a vessel on navigable waters. *Id.* at 365, 110 S.Ct. 2892. The Court then looked to the definition of "traditional maritime activity" and concluded that its definition extended "at least to any other activities traditionally undertaken by vessels, commercial or noncommercial." *Id.* at 367, 110 S.Ct. 2892. Docking a vessel at a marina on navigable waters was held to be an essential maritime activity, which brought the case within the Court's admiralty jurisdiction. *Id.*

The final significant case, *Jerome B. Grubart, Inc. v. Great Lakes Dredge &*

*Dock Co.,* 513 U.S. 527, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995), held that admiralty jurisdiction extends to claims for damages caused by a vessel's pile driving activities in the Chicago River which weakened underground tunnels and caused flooding of several Chicago buildings. There, the Supreme Court held that the first prong of the inquiry turned "on a description of the incident at an intermediate level of possible generality," which the Court described as damage by a vessel in navigation to an underwater structure. *Id.* at 539, 115 S.Ct. 1043. Turning the second inquiry, the Court discussed "whether a tortfeasor's activity, commercial or noncommercial, on navigable waters is so closely related to activity traditionally subject to admiralty law that the reasons for applying special admiralty rules would apply in the suit at hand," concluding that this test was met because the case concerned maintenance work being done on a navigable waterway performed by a vessel in navigation. *Id.* at 539–40, 115 S.Ct. 1043. *Grubart* also sounded the death knell for *Kelly v. Smith.* Maraist & Galligan, § 4–2(g) at 39. In *Grubart,* the Court flatly rejected multi-factor tests such as that presented in *Kelly.*[1]

## III. ANALYSIS

■ Together, *Executive Jet, Foremost, Sisson,* and *Grubart* developed a two part test for determining maritime nexus sufficient to establish admiralty jurisdiction. First, the court must assess the general features of the type of incident involved to determine whether the incident has a potentially disruptive impact on maritime commerce. Next, the court must examine the general conduct from which the inci-

---

1. Sitting *en banc,* the Fifth Circuit abandoned *Kelly* and applied the *Sisson/Grubart* incident/activity test in *Coats v. Penrod Drilling Corp.,* 61 F.3d 1113 (5th Cir.1995). However, the Fifth Circuit later cited the abrogated *Kelly* factors in *Green v. Vermilion Corp.,* 144 F.3d 332, 336 (5th Cir.1998).

dent arose to determine whether there is a substantial relationship between the activity giving rise to the incident and traditional maritime activity. This Court finds that plaintiff has failed to establish a sufficient maritime nexus here due to a lack of potential impact on maritime commerce. Consequently, his claims are not within the Court's admiralty jurisdiction and, therefore, must be dismissed.

The accident in question did not present a potentially disruptive impact on maritime commerce. Indeed, plaintiff neglects to cite any legal authority in support of his maritime commerce disruption claim. Instead, plaintiff relies on the strained position that plaintiff Arch's accident has disrupted maritime commerce by depriving the marine economy of a lifelong seafarer and maritime laborer. In support of this novel claim, plaintiff argues that the fact that he has not worked as a seaman since the accident has created an actual interference with maritime commerce.

This Court does not find that plaintiff's exclusion from the marine workforce sufficiently disrupted maritime commerce to invoke admiralty jurisdiction. At the time of plaintiff's accident, the M/V TREASURE CHEST had been permanently moored for over a year. During that time, the vessel was stationary and did not engage in maritime commerce. In fact, since July 2001, the United States Coast Guard has required that the M/V TREASURE CHEST remain "continuously moored," thus restricting the vessel from engaging in maritime commerce. Likewise, plaintiff, an employee stationed on that idle vessel, was more than a year removed from commercial maritime employment and seaman status. As Judge Fallon observed in *Hertz*, "[h]is vessel has been beached." *Hertz*, 274 F.Supp.2d at 807. Consequently, plaintiff's injuries did not deprive the maritime economy of an a active marine employee. Clearly, an acci-

dent aboard a vessel no longer engaging in maritime commerce injuring a laborer no longer contributing to the marine economy does not even potentially disrupt maritime commerce. Arch's connection with maritime commerce is too attenuated to invoke admiralty jurisdiction under *Executive Jet* and its progeny.

Having determined that plaintiff has failed to satisfy the first prong of the Supreme Court's admiralty jurisdiction test, a discussion of the relationship between plaintiff's acts and traditional maritime activities is unnecessary. Thus, although plaintiff has satisfied the locus aspect of the "locality plus" admiralty jurisdiction determination, Arch has failed to meet the nexus requirement. Consequently, this matter is not within the admiralty jurisdiction of the general maritime law and must be dismissed. Accordingly,

**IT IS ORDERED** that defendant's Motion for Summary Judgment (Rec.Doc. 22) is hereby **GRANTED** and plaintiff's claims are hereby **DISMISSED WITH PREJUDICE.**